Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER SCHMIDT, Individually, and as Successor in Interest to GILBERT GONZALO GIL, and LYNDZY BIONDO, Individually. | Case No. **'23CV0899 W   DDL** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. 14th AMENDMENT – OBJECTIVE INDIFFERENCE** |
| COUNTY OF SAN DIEGO, SILVIA SAUKING, an individual, AND DOES 1-10, inclusive, | **2. 14TH AMENDMENT – INADEQUATE MEDICAL AND MONITORING POLICIES** |
| Defendants. | **3. 14TH AMENDMENT – FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE** |
| | **4. DEPRAVATION OF FAMILIAL ASSOCIATION** |
| | **5. BANE ACT – §52.1** |
| | **6. NEGLIGENCE – §377.30** |
| | **7. WRONGFUL DEATH – §377.60** |

COMPLAINT                                             CASE NO.

# I.

## FACTUAL ALLEGATIONS

1.    Gilbert Gil (herein "Mr. Gil") was a native San Diegan.  He was a master mechanic, devoted father, and a loving grandfather.  He had never been in trouble with the law in his 67 years of living prior to February of 2022.  Tragically, his first encounter with law enforcement resulted in his premature death.

2.    On February 13, 2022, due to symptoms of early on-set dementia and uncontrolled diabetes, Mr. Gil was sitting in his bedroom when he began speaking and acting strange and erratic.  Mr. Gil's nephew called the police for help.  When the Escondido police arrived, they acknowledged Mr. Gil's distress but wrongfully assumed his behavior was associated with methamphetamine use.

3.    Escondido police arrested Mr. Gil for being under the influence.  Prior to transporting him to Vista Detention Facility ("VDF"), at 11:30 p.m., Mr. Gil was taken to Palomar Medical Center Emergency Department ("PMCED") to determine if he was medically cleared to be detained.  Due to Mr. Gil's severe medical distress, he was not capable of consenting to medical treatment.  The PMCED doctor informed Escondido Officer Donaghy, "based on a *visual* examination, Mr. Gil *appears* medically safe to detain …however, additional tests should be performed."  DOE doctor instructed Officer Donaghy that Mr. Gil needed to be brought back to PMCED if he started experiencing "chest pain or palpitations." The doctor filled out a discharge form to that effect, which Officer Donaghy provided to Defendant Silvia Sauking, the medical intake nurse at VDF.

4.    During the intake process, Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status, and confusion; which are signs and symptoms associated with early on-set dementia and uncontrolled diabetes.

5.    Defendant Silvia Sauking noted that Mr. Gil suffered from hypertension and diabetes mellitus.  Defendant Silvia Suaking failed to implement a medical treatment plan or follow-up plan relating to Mr. Gil's hypertension.

COMPLAINT                                          CASE NO.

Defendant Silvia Sauking performed a glucose test, which came back at 253. Due to this high glucose reading, Defendant Silvia Sauking administered 5 units of insulin to Mr. Gil, per the operative Standard Nursing Procedure ("SNP"). According to the county's diabetes SNP, Mr. Gil was to have his glucose levels checked at least three times a day. Limited medical records indicate that Defendant Silvia Sauking did not order follow-up glucose testing three times a day as directed by the county's diabetes SNP. Defendant Silvia Sauking's medical entry indicates she did not communicate or educate Mr. Gil on his glucose levels because Mr. Gil was unstable at the time.

6.    During the intake evaluation, Defendant Silvia Sauking read the discharge instructions from PMCED and was put on notice that Mr. Gil did not undergo a medical clearance at PMCED because he could not consent to medical treatment due to the level of his medical distress. Defendant Silvia Sauking also knew that the PMCED doctor ordered Mr. Gil be monitored for "chest pain and palpitations," and to be brought back to PMCED if those symptoms occurred. Defendant Silvia Sauking failed to implement a directive to monitor Mr. Gil for chest pains and palpitations, as ordered by the PMCED doctor. Defendant Silvia Sauking also failed to input the discharge medical instructions into the jail's electronic medical system preventing the opportunity for follow-on care.

7.    Less than an hour later, during the booking process, Mr. Gil lost his balance and fell. Unknown deputies placed Mr. Gil in a wheelchair to prevent him from falling again. According to the San Diego Medical Examiner's report, Unknown DOE deputies had a difficult time processing Mr. Gil due to him being under the influence. Under a wrong and unreasonable assumption that Mr. Gil was "heavily" under the influence, Mr. Gil was placed in a holding cell to "sober up."

/ / /

/ / /

/ / /

3

COMPLAINT                                                CASE NO.

8. Mr. Gil was placed in the holding cell, alone, at 3:44 a.m. Despite knowing Mr. Gil needed medical treatment and monitoring for hypertension, high glucose levels, chest pains, and heart palpitations, Defendant Silvia Sauking and DOE Deputies #1-5 ignored Mr. Gil for the next **14 hours**.

9. At 8:34 a.m., five hours after being placed in the holding cell, Mr. Gil removed his pants and defecated all over himself and the cell. Despite this clear indication of medical distress, not one person checked on Mr. Gil or provided him with medical treatment for the next nine hours he was in the holding cell. In fact, no one entered the cell or communicated with Mr. Gil during the 14 hours he was detained in the holding cell until 6:03 p.m., on February 14, 2022, when he was discovered dead.

10. Based on a toxicology report from an independent autopsy, Mr. Gil did not have drugs in his system at the time of his death. (Exhibit 1.) As such, at all times relevant to this complaint, Mr. Gil's unstable behavior was associated with severe medical distress, not drug use. According to the independent autopsy, the cause of death was hypertensive cardiovascular disease with cardiomegaly. This finding confirms that Mr. Gil died from cardiac complications that should have been monitored and treated by jail staff, as directed by the PMCED discharge instructions.

11. In the end, Mr. Gil never "sobered-up" because he was not under the influence. Rather, throughout his fourteen hours of detainment, Mr. Gil experienced worsening signs of medical distress, which were intentionally ignored by VDF staff. Had Defendants not unreasonably assumed Mr. Gil was "heavily under the influence," and instead treated him like a human being in need of medical assistance, he would still be alive today.

12. Unfortunately, Mr. Gil was among numerous individuals that died in-custody due to the County's constitutionally inadequate treatment of sick inmates. In 2022, underline nineteen inmates died in San Diego County jails. Due to its horrific in-

COMPLAINT                                      CASE NO.

custody death rate over the last ten years, the California State Auditor issued a scathing report on San Diego County jail deaths.  The Auditor found that San Diego County jails had the **most** in-custody deaths than any other county in California. The Auditor found the County "failed to adequately prevent and respond to the problem and called for legislative action" to force the County to incorporate nationally recognized standards to prevent foreseeable deaths.

13.    The Auditor's report stated, "The high rate of death in San Diego County jails compared to other counties raises concerns and suggests that **underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody**."  After a thorough inspection of the jail and an audit of its policies and practices, the Auditor concluded, "**significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."**  For these reasons, the County is equally responsible for Mr. Gil's premature death.

14.    Mr. Gil's two daughters, Jennifer and Lyndze, were distraught by the news that their father died in-custody in such a dehumanizing way.  Since his passing, Mr. Gil's daughters have lived with broken and heavy hearts.  They brought this action not only to hold Defendants accountable, but to prevent other families from needlessly experiencing similar heartache and devastation.

  

5

COMPLAINT                                          CASE NO.

## II.

## JURISDICTION AND VENUE

15.    This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983.  The Jurisdiction of this court is invoked pursuant to 28 U.S.C. section 1331.  State law claims are alleged as well, over which Plaintiffs invoke the Court's supplemental jurisdiction.

16.    This case is instituted in the United States District Court for the Southern District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.

17.    Pursuant to the California Government Code, Plaintiffs filed their tort claim with the County of San Diego based on the foregoing incident on July 22, 2022, and amended their claim on August 2, 2022.  The claim was rejected on November 16, 2022.  Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

## III.

## THE PARTIES

18.    Mr. Gil was a resident of San Diego County in the State of California and a citizen of the United States at all times relevant to this complaint.  He died in-custody at VDF, which is located in the County of San Diego.

19.    Jennifer Schmidt is Gil Gilbert's daughter and brings this lawsuit individually and as his Successor in Interest.  (Exhibit 2.)  At all times relevant to this Complaint, Jennifer Schmidt resided in the County of San Diego.

20.    Lyndzy Biondo is Gil Gilbert's daughter and brings this lawsuit individually.  At all times relevant to this Complaint, Lyndzy Biondo resided in the County of San Diego.

/ / /

6

COMPLAINT                                        CASE NO.

21.   Defendant Silvia Sauking worked at VDF during all times relevant to this Complaint and performed the wrongful acts alleged in this Complaint while working at VDF.  Based on information and belief, Defendant lives in the County of San Diego at all times mentioned herein, and committed the culpable acts against Mr. Gil in the same county.

22.   Defendant County of San Diego ("county") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Diego County citizens.  At all times mentioned herein, Defendant county was responsible for overseeing the operation, management, and supervision of the San Diego County jails such as VDF, as well as its Corrections Deputies, Medical Staff, and inmates.  The county is also responsible for developing, implementing, and amending jail policies, procedures, and training.  The county has a non-delegable duty to provide adequate medical care and cannot contract out that obligation to third-party medical groups.

23.   The names of the other individual Sheriff's Deputies and Medical staff who are responsible for Mr. Gil's severe medical condition are currently unknown to Plaintiffs.  As such, these individuals are sued herein as DOES 1-10, and referred to herein as "DOES."

24.   The true names and capacities whether individual, corporate, associate or otherwise, of defendants named herein as DOES 1-10 are unknown to Plaintiffs, who therefore sue said defendants by said fictitious names.  Plaintiffs will amend this complaint to show said Defendants' true names and capacities when the same have been ascertained.  Plaintiffs are informed and believe and thereon allege that all defendants sued herein as DOES are in some manner responsible for the acts and injuries alleged herein.

25.   At all times mentioned herein Defendants named herein as DOES 1-10 were employees and/or independent contractors of Defendant San Diego County

COMPLAINT                                           CASE NO.

and in doing the acts hereinafter described conspired together and acted within the course and scope of their employment. The acts of all defendants and each of them were also done under the color and pretense of the statutes, ordinances, and regulations of the County of San Diego and the State of California. In committing the acts and/or omissions alleged herein, all defendants acted under color of authority and/or under color of law. Plaintiffs sue all public employees named as Defendants in their individual capacities.

## IV.

## **FACTUAL BACKGROUND**

26.     On February 12, 2022, **two days before his premature passing**, due to the confusion associated with early on-set dementia, at the age of 67-years-old, Mr. Gil crashed his truck into a ditch in Escondido, California. This would result in his first negative interaction with law enforcement.

27.     California Highway Patrol ("CHP") found Mr. Gil inside the truck. It is unknown at this time if Mr. Gil was under the influence based on alleged statements he made; however, CHP arrested him for being under the influence.

28.     Around that same time, Mr. Gil's daughter, Jennifer, noticed that her father had not come over as he did every night. Jennifer checked an app on her phone and discovered that her father had been in a car accident. Jennifer got in her car and drove to the scene. When she arrived, Mr. Gil was being placed in the back of a patrol car. Jennifer asked CHP what was happening. The officers told Jennifer that he was being arrested for being under the influence.

29.     Jennifer noticed that her father was showing signs of thought disorganization, nonsensical communication, altered mental status, and confusion. Jennifer informed the CHP officers that these symptoms were associated with early on-set dementia and uncontrolled diabetes.

30.     CHP officers insisted on arresting Mr. Gil. This was Mr. Gil's first arrest in his 67 years. When the officers transported Mr. Gil to VDF, it is unknown

COMPLAINT                                              CASE NO.

whether the officers informed VDF intake staff that Mr. Gil was suffering from early on-set dementia and diabetes as relayed to them by Jennifer.  Based on information and belief, Mr. Gil was placed in a "book and release" holding cell that night.

31.    Early the next morning, Jennifer contacted the CHP officer that arrested her father to determine his whereabouts.  Jennifer was informed her father had been booked into VDF as a book and release.  Jennifer checked the Sheriff's website and noticed that Mr. Gil was on the release cue.  Inmates on the release que are usually released between 7:00 a.m. and 9:00 a.m.  At 9:00 a.m., Mr. Gil had not been released yet.  At that time, Jennifer immediately called the jail to inquire about her father and told the jail employee that her father was supposed to be released.  The unknown employee placed Jennifer on hold and transferred her to the medical services division.

32.    An unknown medical nurse told Jennifer that Mr. Gil was in a book and release cell but was not "sobering up" so she was not sure when he would be released.  In response, Jennifer informed the medical employee that Mr. Gil was suffering from symptoms of early on-set dementia and uncontrolled diabetes. Jennifer told the unknown employee, "He's not going to sober up, he's sick not. This is not a drug issue."  The jail employee told Jennifer she would call her back after speaking to her supervisor.  A minute later, the jail employee called Jennifer and told her to meet her in the lobby and they would release Mr. Gil into her custody.

33.    Jennifer immediately picked up Mr. Gil in the VDF lobby.  She had to sign her father's property paperwork because he was physically incapable of doing so due to severe medical distress. Jennifer took Mr. Gil to his home to eat and sleep, hoping that would help calm him.  Later that night, Mr. Gil again exhibited bizarre behavior indicating severe confusion and distress.  A family member called 911 to request help.  Escondido Police arrived at the home.  The police were led to

COMPLAINT                                          CASE NO.

Mr. Gil's bedroom. Mr. Gil was in severe medical distress and exhibiting bizarre behavior. Escondido Police arrested Mr. Gil in his own bedroom for being under the influence.

34. Prior to transporting him to VDF, at 11:30 p.m., Mr. Gil was taken to PMCED to determine if he was medically cleared to be detained. Due to Mr. Gil's severe medical distress, he was not capable of consenting to medical treatment. The PMCED doctor informed Escondido Officer Donaghy, "based on a *visual* examination, Mr. Gil *appears* medically safe to detain …however, additional tests should be performed." DOE doctor instructed Officer Donaghy that Mr. Gil needed to be brought back to PMCED if he started experiencing "chest pain or palpitations." The doctor filled out a discharge form to that effect, which Officer Donaghy provided to Defendant Silvia Sauking, the medical intake nurse at VDF.

35. Upon intake and booking, DOE VDF staff should have known that Mr. Gil had just been booked and released hours prior and that he was released into his daughter's care due to signs of severe medical distress not associated with being under the influence. However, VDF staff failed to make that connection.

36. During the intake process, Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status, and confusion; which are signs and symptoms associated with early on-set dementia and uncontrolled diabetes.

37. The intake paperwork indicates that Defendant Silvia Sauking knew that Mr. Gil suffered from hypertension and diabetes mellitus. Defendant Silvia Sauking failed to implement a medical treatment plan or follow-up plan relating to Mr. Gil's hypertension. Defendant Silvia Sauking performed a glucose test, which came back at 253. Due to this high glucose reading, Defendant Silvia Sauking administered 5 units of insulin to Mr. Gil, per the operative Standard Nursing Procedure. According to the county's diabetes SNP, Mr. Gil was to have his glucose levels checked at least three times a day. Limited medical records indicate that Defendant Silvia Sauking did not order follow-up glucose testing three times a

10

COMPLAINT                                    CASE NO.

day as directed by the county's diabetes SNP.  Defendant Silvia Sauking's medical entry indicates she did not communicate or educate Mr. Gil on his glucose levels because Mr. Gil was too unstable at the time.

38.    During the intake evaluation, Defendant Silvia Sauking read the discharge instructions from PMCED and was put on notice that Mr. Gil did not undergo a medical clearance at PMCED because he could not consent to medical treatment due to the level of his medical distress.  Defendant Silvia Sauking also knew that the PMCED doctor ordered Mr. Gil to be monitored for "chest pain and palpitations," and to be brought back to PMCED if those symptoms occurred. Defendant Silvia Sauking failed to implement a directive to monitor Mr. Gil for chest pains and palpitations, as ordered by the PMCED doctor.  Defendant Silvia Sauking also failed to input the discharge medical instructions into the jail's electronic medical system, Sapphire, preventing the opportunity for follow-on care. Additionally, Defendant Silvia Sauking also failed to adhere to the SNP for hypertension and chest pains.

39.    Less than an hour later, during the booking process, Mr. Gil lost his balance and fell.  Unknown deputies placed Mr. Gil in a wheelchair to prevent him from falling.  According to the San Diego Medical Examiner's report, Unknown DOE deputies had a difficult time processing Mr. Gil due to him being under the influence.  Under a wrong and unreasonable assumption that Mr. Gil was "heavily" under the influence, and in disregard of the PMCED discharge instructions, Defendants Sauking and DOE Deputies made the decision to place Mr. Gil in a holding cell to "sober up."

40.    Mr. Gil was placed in the holding cell, alone, at 3:44 a.m.  Despite knowing Mr. Gil needed medical treatment and monitoring for hypertension, high glucose levels, chest pains, and heart palpitations, Defendant Silvia Sauking and DOE Deputies #1-5 ignored Mr. Gil for the next **14 hours**.

/ / /

COMPLAINT                                    CASE NO.

41.    At some point, Defendant Silvia Sauking left her shift without endorsing Mr. Gil to the follow-on shift, ensuring that Mr. Gil would continue to be ignored by the medical staff.

42.    At 8:34 a.m., five hours after being placed in the holding cell, Mr. Gil removed his pants and defecated all over himself and the cell.  Despite this clear indication of medical distress, not one person checked on Mr. Gil or provided him with medical treatment for the next nine hours he was in the holding cell.  In fact, no one entered the cell or communicated with Mr. Gil during the 14 hours he was detained in the holding cell until 6:03 p.m., on February 14, 2022, when he was discovered dead and cold to the touch.

43.    Based on a toxicology report from an independent autopsy, Mr. Gil did not have drugs in his system at the time of his death.  As such, at all times relevant to this complaint, Mr. Gil's unstable behavior was associated with severe medical distress, not drug use.  According to the independent autopsy, the cause of death was "hypertensive cardiovascular disease with cardiomegaly."  This finding confirms that Mr. Gil died from cardiac complications that should have been monitored and treated by jail staff, as directed by the PMCED discharge instructions.

44.    In the end, Mr. Gil never "sobered-up" because he was not under the influence.  Rather, throughout his fourteen hours of detainment, Mr. Gil experienced worsening signs of medical distress, which were intentionally ignored by VDF staff.  Had Defendants not unreasonably assumed Mr. Gil was "heavily under the influence," and instead treated him like a human being in need of medical assistance, he would still be alive today.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                                      CASE NO.

## V.

## FIRST CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment – Objective Indifference

### [By Jennifer Schmidt, as Successor in Interest, Against Defendant Silvia Sauking and DOES 1-10]

45.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

46.    Under the Fourteenth Amendment, as a pretrial detainee, Mr. Gil has a guaranteed right to adequate medical care while in the custody and control of the County.

47.    As alleged above, while acting under the color of law, Defendant Silvia Sauking performed the intake receiving screening when Mr. Gil arrived at VDF.  According to County policy, the receiving screening is "a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment."

48.    During the receiving screening, Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status, and confusion, signs and symptoms associated with early on-set dementia and uncontrolled diabetes.

49.    Defendant Silvia Sauking learned that Mr. Gil suffered from hypertension and diabetes mellitus.  Defendant Silvia Suaking failed to implement a medical treatment plan or follow-up plan relating to Mr. Gil's hypertension. Defendant Silvia Sauking performed a glucose test, which came back at 253.  Due to this high glucose reading, Defendant Silvia Sauking administered 5 units of insulin to Mr. Gil, per the operative Standard Nursing Procedure. According to the county's diabetes SNP, Mr. Gil was to have his glucose levels checked at least three times a day.  Limited medical records indicate that Defendant Silvia Sauking did

COMPLAINT                                              CASE NO.

not order follow-up glucose testing as directed by the county's diabetes SNP. Defendant Silvia Sauking's medical entry indicates she did not communicate or educate Mr. Gil on his glucose levels because Mr. Gil was too unstable at the time.

50.    During the intake evaluation, Defendant Silvia Sauking read the discharge instructions from PMCED and was put on notice that Mr. Gil did not undergo a medical clearance at PMCED because he could not consent to medical treatment due to the level of his medical distress.  Defendant Silvia Sauking also knew that the PMCED doctor ordered Mr. Gil to be monitored for "chest pain and palpitations," and to be brought back to PMCED if those symptoms occurred. Defendant Silvia Sauking failed to implement a directive to monitor Mr. Gil for chest pains and palpitations, as ordered by the PMCED doctor.  She also failed to alert her supervising charge nurse that Mr. Gil required continued monitoring. Defendant Silvia Sauking also failed to input the discharge medical instructions into the jail's electronic medical system, Sapphire, further preventing the opportunity for follow-on care.  Additionally, Defendant Silvia Sauking also failed to adhere to the SNP for hypertension and chest pains despite reviewing the PMCED discharge instructions.

51.    Furthermore, pursuant to the county's receiving policy, due to Mr. Gil's thought disorganization, nonsensical communication, altered mental status, and confusion, Defendant Silvia Sauking should have sent Mr. Gil back to PMCED since a medical physician was not available at that time of day.

52.    Defendant Silvia Sauking was also obligated to assess Mr. Gil for mild, moderate, or severe signs of medical distress with the purpose of determining if further screening is necessary. Under the circumstances detailed above, Defendant Silvia Sauking should have identified Mr. Gil for Nurse Assessment Protocol ("NAP").  Such a designation would have obligated Defendant Silvia Sauking to: 1) notify the NAP registered nurse, 2) notify the intake deputy, and 3) schedule Mr. Gil in the electronic medical record under NAP medical encounter;

14

and indicate additional information, such as the PMCED discharge instructions.
Had this been done based on Mr. Gil's hypertension, diabetes, and altered mental
status, Mr. Gil would have been assessed and evaluated no later than 5:09 a.m. Had
Mr. Gil gone through the NAP process, he would have been placed on all indicated
SNPs and would have been evaluated by the jail medical doctor first thing in the
morning. Based on Mr. Gil's worsening symptoms of medical distress, a medical
evaluation would have resulted in immediate medical intervention or transportation
to PMCED. Such intervention would have spared Mr. Gil's life.

53. Instead of following policy and procedures, which required Defendant
to implement all indicated SNPs and schedule an urgent medical assessment,
Defendant Silvia Sauking failed to properly screen and identify Mr. Gil's needs.
She also failed to implement SNPs for hypertension, diabetes, and chest pain. The
screening policy also required that Mr. Gil be housed in a medical bed that is
located in the Medical Observation Unit.

54. If Defendant Silvia Sauking implemented the hypertension SNP, Mr.
Gil would have been administered Clonidine, which is an antihypertensive drug that
lowers blood pressure and heart rate. Mr. Gil also would have been monitored for
signs and symptoms of headache, dizziness, and/or chest pain. Mr. Gil would also
have had repeated blood pressure checks throughout his detainment.

55. If Defendant Silvia Sauking comprehensively implemented the
diabetes SNP, Mr. Gil would have had his glucose levels monitored three times
during his detainment, the soonest occurring four hours after intake.

56. If Defendant Silvia Sauking implemented the chest pain SNP, as
indicated by the PMCED discharge instructions, Mr. Gil would have received a 12
lead EKG and a cardiac assessment. If Mr. Gil had an abnormal EKG reading, he
would have seen a medical physician or been sent to PMCED immediately.

57. Had Defendant Silvia Sauking followed policy, Mr. Gil would not
have been ignored for fourteen hours while experiencing worsening medical

COMPLAINT                                          CASE NO.

distress.  Conversely, if Defendant Silvia Sauking followed policy, Mr. Gil would have received repeated instances of medical treatment.

58.     Lastly, according to County policy, Defendant Silvia Sauking and DOES 6-10 were required to review the discharge instructions and input them in the electronic system.  Silvia Sauking and DOES 6-10 were also required to implement the directives set forth in the discharge instructions.  If that had happened, Mr. Gil would have been routinely monitored for chest pain and palpitations.  Notably, given Mr. Gil's cause of death, had he been monitored as indicated by the PMCED discharge instructions, his worsening symptoms would have been detected and treated promptly.

59.     Based on information and belief, if a medical professional interacted with Mr. Gil at any time while experiencing worsening symptoms, Mr. Gil would have been sent to PMCED immediately and would have received life-saving care.

60.     Silvia Sauking and DOE NURSES 6-10 were grossly indifferent to Mr. Gil's serious medical needs because Defendants were aware of Mr. Gil's medical distress but intentionally failed to adequately screen, assess, or follow-up with Mr. Gil despite several policy directives requiring otherwise.

61.     DOE Deputies 1-5 are also responsible for Mr. Gil's death because each Defendant knew Mr. Gil was suffering from worsening symptoms of medical distress.  Initially, Mr. Gil was displaying signs of thought disorganization, nonsensical communication, altered mental status, and confusion, all symptoms associated with early on-set dementia and uncontrolled diabetes.   Based on Mr. Gil's charges, Defendant Silvia Sauking and DOES 1-10 wrongfully, and without adequate assessment, assumed Mr. Gil was under the influence of methamphetamines.  Despite knowing that Mr. Gil was in distress, and the PMCED discharge instructions required return if signs of chest pain and palpitations occurred, Defendant Silvia Sauking and DOES 1-10 left Mr. Gil in the holding cell for 14 hours without monitoring or intervention.

COMPLAINT                                              CASE NO.

62.     Title 15 sets forth the minimum standards and requirements for local detention facilities, including San Diego County jails. Title 15 requires inmate safety checks to be conducted at least hourly through "direct visual observation." Based on information and belief, the holding cell Mr. Gil was left in is checked every 30 minutes.  Meaning, after Mr. Gil defecated on himself and in the cell, and was not stable enough to pull his pants back up, and was showing worsening signs of confusion and disorientation, DOE Deputies 1-10 performed over a dozen cell checks wherein each DOE Deputy saw Mr. Gil in severe medical distress yet intentionally failed to intervene.

63.     Any reasonable deputy or nurse under the same circumstances would have recognized that Mr. Gil was in severe medical distress and would have promptly provided or obtained adequate medical treatment.

64.     As a result of each Defendants' deliberate indifference, Mr. Gil suffered for fourteen hours without help or medical aid.  He was left to die in the holding cell despite each Defendants knowing he was experiencing severe symptoms associated with early on-set dementia and uncontrolled diabetes.

65.     Based on the injuries alleged above, and Mr. Gil's premature death, Mr. Gil's successor in interest is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate Mr. Gil for his pain, suffering, loss of life, and for the violation of his Constitutional and civil rights.

66.     In addition to compensatory, economic, consequential, and special damages, Mr. Gil's successor in interest is entitled to punitive damages against each Defendant under 42 U.S.C. section 1983, in that their actions were done intentionally and with the intent to violate Plaintiffs' right, or were done with a reckless disregard or wanton disregard for Mr. Gil's constitutional rights.

/ / /

/ / /

/ / /

17

COMPLAINT                                          CASE NO.

# VI.

## <u>SECOND CAUSE OF ACTION</u>

**42 U.S.C. Section 1983 – 14th Amendment – Inadequate Medical and Monitoring Policies**

**[By Jennifer Schmidt, as Successor in Interest, Against San Diego County and DOE Supervisors]**

67.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

68.     Defendants were charged with the duty to act in accordance with the laws of state and the Constitution and to provide treatment in accordance with a reasonable standard of care.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to act as a reasonable medical professional would in the same or similar circumstances.

69.     In 2022, <u>nineteen</u> inmates died in San Diego County jails. Due to its horrific in-custody death rate over the last ten years, the California State Auditor issued a scathing report on San Diego County jail deaths.  The Auditor found that San Diego County jails had the **most** in-custody deaths than any other county in California.  The Auditor found the County "failed to adequately prevent and respond to the problem and called for legislative action" to force the County to incorporate nationally recognized standards to prevent foreseeable deaths.

70.     The Auditor's report stated, "The high rate of death in San Diego County jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody."  After a thorough inspection of the jail and an audit of its policies and practices, the Auditor concluded, "significant deficiencies in the Sheriff's

/ / /

COMPLAINT                                              CASE NO.

Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."

71.    The Auditor also found, "There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails."

72.    Years prior to the State Auditor's investigation, the National Commission on Correctional Health Care (NCCHC) found similar deficiencies. The NCCHC sets standards for health services in correctional facilities, operates an accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences and offers certification for correctional health professionals.  On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.  In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.  Of the 39 "essential standards" all of which must be met in order to attain accreditation, the VDF failed to meet 26 standards.

73.    Specifically, of the various discrepancies found by the above regulatory groups, there are four key policy deficiencies that, if previously cured, would have made a difference in this case.

74.    First, the Auditor found "staff did not always properly identify incarcerated individuals' medical and mental health needs at intake.  Consequently, some of these individuals did not receive proper care, likely contributing to their deaths."  According to the Auditor, identifying individuals' health care needs at intake is critical to ensuring their safety in custody.

75.    Here, Mr. Gil's confusion and altered mental status was not properly identified or treated.  Nor was his hypertension, diabetes, and overall need for monitoring, as indicated by the PMCED discharge paperwork.  Had the County took the Auditor's findings seriously, and properly trained its staff to screen

COMPLAINT                                      CASE NO.

inmates in medical distress to ensure immediate care, Mr. Gil would still be alive today. A proper screening and designation at the intake stage would ensure Mr. Gil was monitored by a medical professional who would have acknowledged Mr. Gil's worsening signs and would have provided immediate care.

76. The Auditor also found that "Detention staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths." The Auditor found, "Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's' Department did not consistently follow up—*such as poor policies and communication*—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address. Here, despite acknowledging Mr. Gil was in distress, and after reviewing the PMCED discharge instructions, all Defendants ignored Mr. Gil for fourteen hours, until he was found dead and cold to the touch.

77. Another issue presented in this case is that lack of continuity of care. For example, Mr. Gil was booked in jail the day before his death. Based on his bizarre behavior, and a failure to monitor and evaluate Mr. Gil, it was wrongfully assumed that he was under the influence on February 12, 2022, leading to the morning of February 13, 2022. However, Jennifer informed jail staff that Mr. Gil "would never sober up" because he was not under the influence but rather severely ill. Specifically, Jennifer told jail staff that the behavior Mr. Gil was displaying was caused by early on-set dementia and uncontrolled diabetes. Had the County maintained an adequate database used for retaining inmate health records, wherein employees are required to review the latest medical information of each inmate, Defendant Silvia Sauking would have been on notice that Mr. Gil was suffering from symptoms of early on-set dementia and uncontrolled diabetes, rather than being under the influence.

COMPLAINT                                    CASE NO.

78.     In reviewing the deaths that occurred within County jails, the State Auditor also found, "deputies performed inadequate safety checks to ensure the well-being of those individuals."  Moreover, as it pertains to hourly safety checks, the Auditor found,

> "In our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks."

79.     Importantly, the Auditor found that the county was on notice of many of the identified policy deficiencies based on the previous recommendations from other external oversight entities, including the San Diego Grand Juries and Disability Rights California.  Despite recommendations to address these policy deficiencies, "the county did not take actions even though they were critical to improving the safety of individuals in its custody."

80.     Notably, lawsuits against the County must adequately allege a similar pattern of preventable injuries and/or deaths in order to maintain a municipal claim for an inadequate policies and procedures.  In an effort to stifle plaintiffs' attempt to comply with this burden of proof, the county has stopped reporting in-custody deaths, effectively making it nearly impossible to know the details regarding in-custody deaths without discovery.

81.     As such, Plaintiffs are at the whim of what local publications report and similar lawsuits filed against the County.  Based on available information in the public realm, County Defendants were aware of the following examples of

21

COMPLAINT                                                    CASE NO.

subordinates' failures to coordinate and share critical medical information among personnel and failures to render emergent medical care to seriously ill inmates, causing inmates to die or suffer serious injuries:

a. In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing." The County rejected this recommendation.

b. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him. The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell due to the lack of communication between staff.

c. In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell. Staff had failed to input critical medical information in the JIMS system. Staff had failed to communicate with each other regarding Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

/ / /

COMPLAINT                                    CASE NO.

d.  In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts.  When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center.  The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do?  Kill yourself?  Take that thing down."  This deputy failed to communicate this information to other jail staff.  No other jail staff took any further action.  Mr. NeSmith was later found dead, having hung himself.

e.  In 2014, Ronnie Sandoval died in the Jail from drug overdose.  Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented.  The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs.  The nursing staff did not summon help or treat him for overdose.  The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change.  Mr. Sandoval died from drug intoxication after being ignored in the holding cell for nine hours.

f.  In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street.  At the time of his arrest, Mr. Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated to jail staff.  At the Jail, he fell face-forward off a bench.  Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if screened and treated properly.

/ / /

23

g.    In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts," meaning the most critical information regarding a patient's care. She testified that she was never trained. Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse told Mr. Nunez to drink plenty of water. This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have time to determine whether the Jail can book the person into jail.

h.    In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it.

82.    As detailed above, the facts of this case bear out an additional policy and training deficiency that the County has known about for over a decade. Namely, Defendants knew of a long history of subordinates were failing to conduct proper cells checks or failing to follow jail policies regarding care and monitoring of seriously ill inmates, including these prior cases:

a.    In Mr. Sisson's death in 2011, jail deputies failed to check on Mr. Sisson for hours. Mr. Sisson later died during a drug withdrawal.

24

COMPLAINT                            CASE NO.

b.    In 2012, as Mr. Victorianne laid on the floor of his cell, naked and unconscious, none of the deputies conducted proper security checks, soft counts or hard counts, which requires the deputies to scan the wrist band of each inmate.  One deputy was told by an inmate that Mr. Victorianne was not breathing.  This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched;" and left him to die in his cell.  These deputies failed to conduct proper checks then lied about it to investigators.

c.    In 2014, Christopher Carroll, who was mentally ill, was placed in segregation.  He was found dead with a noose around his neck.  Mr. Carroll had smeared blood on the wall of his cell.  He had urinated on the floor and food and feces were stuck to the ceiling.  Deputies had failed to conduct proper cell checks to check for his well-being despite Mr. Carroll's known condition.

d.    In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine.  A nurse told this deputy to take Mr. Nunez to Medical.  Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed.  The deputy left Mr. Nunez in his cell to die.

e.    In Mr. NeSmith's case in 2014, a jail deputy saw Mr. NeSmith attempting suicide, but took no action to stop Mr. NeSmith or to call for psychiatric intervention.

f.    In February of 2016, Richard Boulanger hung himself in his cell at the Central Jail.  His cellmate pressed the emergency call button, but no deputy came to the cell for approximately 20 minutes.  A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check.  The investigation revealed that during cell checks, the deputy peered into each cell for

COMPLAINT                          CASE NO.

approximately one second in violation of policy.  The investigation which followed revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard.

g.   As alleged in a lawsuit against the County stemming from its inadequate medical and supervision policies, the County was "placed on notice, subordinates themselves had notified the County that they were not conducting proper cell checks and that glancing into a cell without breaking stride was routine."

83.   Not only was the County on notice that its staff members were intentionally performing inadequate cell checks, the County actively failed to discipline and train its employees regardless of the ample notice it was provided.

84.   In the case of Mr. Victorianne, the supervisors covered up for their subordinates by interfering with the investigation, preventing Homicide investigators from interviewing the last deputies to see Mr. Victorianne alive.  After his own staff issued a recommendation that certain staff members be reprimanded for lying, Defendant Gore refused to follow it.

85.   When Mr. NeSmith's widow sued the County over his death, she cited to the San Diego CityBeat article titled "60 Dead Inmates" by Kelly Davis, an award-winning journalist who exposed the problem of the high death rates in the Jails. San Diego officials then targeted Davis, subpoenaing her to divulge all the information and sources she used for her story, including confidential discussions with attorneys about the wrongful death lawsuits.  The County then filed a motion to compel.  Instead of addressing the known problems in the Jail, its officials targeted this journalist with the intent to silence any criticism and public attention.

86.   Despite well-known problems of deaths and serious injuries from improper monitoring of inmates and failure to render adequate medical care, County officials continued to cover up their subordinates' misconduct.

COMPLAINT                                          CASE NO.

87.    In cases of deaths or serious injuries, there is no policy mandating Internal Affairs investigations of individual deputy conduct to enforce accountability.  The NCCHC audit criticized the Sheriff's Department for failing to conduct a formal peer review process for contract medical providers and nurses. Health care providers were not being informed of any results of death reviews ensuring that the medical providers would continue offering constitutionally inadequate medical services.

88.    The County has not made any attempt to further train jail staff, to monitor them more closely, or to provide additional supervision and oversight.  By failing to discipline, further train, or more closely supervise/monitor its staff, the County ratified their employees' misconduct.

89.    In sum, DOE Supervisor Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate screenings and follow-up treatment.  As a result, Mr. Gil was ignored for fourteen hours while staff knew he was suffering from medical distress and symptoms associated with early on-set dementia and uncontrolled diabetes.  DOE Supervisor Defendants also failed to train and supervise their staff regarding adequate visual safety checks and the need to provide immediate medical care to inmates in medical distress.

90.    DOE Supervisors failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

91.    Defendants have a widespread history of ratifying employee misconduct by failing to supervise and discipline their subordinates.

92.    Defendants were aware of long series of untimely and wrongful deaths in the San Diego County Jails from lack of medical care and failed to properly supervise and discipline their employees or agents.

/ / /

COMPLAINT                                              CASE NO.

93.    Defendants were aware that their correctional staff were failing to properly monitor the Housing units and failing to properly check on the welfare of the inmates.  Defendants were aware that the failure to supervise their employees led to numerous inmate deaths.

94.    Doe supervisors refused to investigate misconduct and/or took no remedial steps or action against deputies and medical staff.

95.    Confronted with information that the misconduct of their subordinates were causing deaths and serious injuries, Defendants refused to implement the recommendations of CLERB (or the State Auditor) to discipline their subordinates.

96.    Instead of disciplining their subordinates, Defendants covered up the misconduct of their staff and contract employees by to ensure that the families of the deceased inmates would not be able to access the courts.

97.    Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical and corrections staff but failed to supervise or discipline them. Many of these supervisors have since left the Sheriff's Department.  Plaintiffs are ignorant of the current DOE Supervisors failing to training and disciple.

98.    There has been an official policy of acquiescence in the wrongful conduct.  Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

99.    Defendants, the County and DOE Supervisors, condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

100.    Defendants were, or should have been, aware that the policy regarding training, supervision, and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

COMPLAINT                                              CASE NO.

101.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to Mr. Gil's needs. The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

102.   In committing the acts alleged above, the individual Defendants acted grossly and/or maliciously and/or were guilty of a wanton and reckless disregard for the rights and feelings of all inmates in need of medical assistance and by reason thereof Mr. Gil's heirs are entitled to exemplary and punitive damages in an amount to be proven at trial.

## VII.

## THIRD CAUSE OF ACTION

**42 U.S.C. Section 1983 – 14th Amendment – Failure to Train, Supervise, and Discipline**

**[By Jennifer Schmidt, as Successor in Interest, Against San Diego County and DOE Supervisors]**

103.   Plaintiffs reallege and incorporates by reference all paragraphs stated above, as though fully set forth herein.

104.   Defendants were charged with the duty to act in accordance with the laws of state and the Constitution and to provide treatment in accordance with a reasonable standard of care.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to as a reasonable medical professional in the same or similar circumstances.

105.   In 2022, <u>nineteen</u> inmates died in San Diego County jails.  Due to its horrific in-custody death rate over the last ten years, the California State Auditor issued a scathing report on San Diego County jail deaths.  The Auditor found that San Diego County jails had the **most** in-custody deaths than any other county in

COMPLAINT                                          CASE NO.

California.  The Auditor found the County "failed to adequately prevent and respond to the problem and called for legislative action" to force the County to incorporate nationally recognized standards to prevent foreseeable deaths.

106.   The Auditor's report stated, "The high rate of death in San Diego County jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody."  After a thorough inspection of the jail and an audit of its policies and practices, the Auditor concluded, "significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."

107.   The Auditor also found, "There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails."

108.   Years prior to the State Auditor's investigation, the National Commission on Correctional Health Care (NCCHC) found similar deficiencies. The NCCHC sets standards for health services in correctional facilities, operates an accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences and offers certification for correctional health professionals.  On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.  In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.  Of the 39 "essential standards" all of which must be met in order to attain accreditation, the VDF failed to meet 26 standards.

109.   Specifically, of the various discrepancies found by the above regulatory groups, there are four key policy deficiencies that, if previously cured, would have made a difference in this case.

30

110.    First, the Auditor found "staff did not always properly identify incarcerated individuals' medical and mental health needs at intake.  Consequently, some of these individuals did not receive proper care, likely contributing to their deaths."  According to the Auditor, identifying individuals' health care needs at intake is critical to ensuring their safety in custody.

111.    Here, Mr. Gil's confusion and altered mental status was not properly identified or treated.  Nor was his hypertension, diabetes, and overall need for monitoring, as indicated by the PMCED discharge paperwork.  Had the County took the Auditor's findings seriously, and properly trained its staff to screen inmates in medical distress to ensure immediate care, Mr. Gil would still be alive today.  A proper screening and designation at the intake stage would ensure Mr. Gil was monitored by a medical professional who would have acknowledged Mr. Gil's worsening signs and would have provided immediate care.

112.    The Auditor also found that "Detention staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths."  The Auditor found, "Best practices stress that timely treatment and follow-up are important components of any health care system.  Although the reasons that the Sheriff's' Department did not consistently follow up—*such as poor policies and communication*—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.  Here, despite acknowledging Mr. Gil was in distress, and after reviewing the PMCED discharge instructions, all Defendants ignored Mr. Gil for fourteen hours, until he was found dead and cold to the touch.

113.    Another issue presented in this case is that lack of continuity of care.  For example, Mr. Gil was booked in jail the day before his death.  Based on his bizarre behavior, and a failure to monitor and evaluate Mr. Gil, it was wrongfully assumed that he was under the influence on February 12, 2022, leading to the

COMPLAINT                                                    CASE NO.

morning of February 13, 2022.  However, Jennifer informed jail staff that Mr. Gil "would never sober up" because he was not under the influence but rather severely ill.  Specifically, Jennifer told jail staff that the behavior Mr. Gil was displaying was caused by early on-set dementia and uncontrolled diabetes.  Had the County maintained an adequate database used for retaining inmate health records, wherein employees are required to review the latest medical information of each inmate, Defendant Silvia Sauking would have been on notice that Mr. Gil was suffering from symptoms of early on-set dementia and uncontrolled diabetes, rather than being under the influence.

114.   In reviewing the deaths that occurred within County jails, the State Auditor found, "deputies performed inadequate safety checks to ensure the well-being of those individuals."  Moreover, as it pertains to hourly safety checks, the Auditor found,

> "In our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks."

115.   Importantly, the Auditor found that the county was on notice of many of the identified policy deficiencies based on the previous recommendations from other external oversight entities, including the San Diego Grand Juries and Disability Rights California.  Despite recommendations to address these policy deficiencies, "the county did not take actions even though they were critical to improving the safety of individuals in its custody."

COMPLAINT                                              CASE NO.

116.   Notably, lawsuits against the County must adequately allege a similar pattern of preventable injuries and/or deaths in order to maintain a municipal claim for a failure to trains, supervise, and discipline.  In an effort to stifle plaintiffs' attempt to comply with this burden of proof, the county has stopped reporting in-custody deaths, effectively making it nearly impossible to know the details regarding in-custody deaths without discovery.

117.   As such, plaintiffs are at the whim of what local publications report and similar lawsuits filed against the County.  Based on available information in the public realm, County Defendants were aware of the following examples of subordinates' failures to coordinate and share critical medical information among personnel and failures to render emergent medical care to seriously ill inmates, causing inmates to die or suffer serious injuries:

a.   In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."  The County rejected this recommendation.

b.   On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal.  The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him.  The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell due to the lack of communication between staff.

c.   In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that

33

COMPLAINT                                    CASE NO.

he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell. Staff had failed to input critical medical information in the JIMS system. Staff had failed to communicate with each other regarding Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

d.   In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts. When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center. The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down." This deputy failed to communicate this information to other jail staff. No other jail staff took any further action. Mr. NeSmith was later found dead, having hung himself.

e.   In 2014, Ronnie Sandoval died in the Jail from drug overdose. Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs. The nursing staff did not summon help or treat him for overdose. The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication after being ignored in the holding cell for nine hours.

COMPLAINT                                                CASE NO.

f.  In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street.  At the time of his arrest, Mr. Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated to jail staff.  At the Jail, he fell face-forward off a bench. Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if screened and treated properly.

g.  In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication.  The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS.  One of the psychiatrists testified that she did not know how to use JIMS to add "alerts," meaning the most critical information regarding a patient's care.  She testified that she was never trained.  Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse told Mr. Nunez to drink plenty of water.  This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once.  The intake nurses only have time to determine whether the Jail can book the person into jail.

h.  In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it.

35

COMPLAINT                                                    CASE NO.

118.   As detailed above, the facts of this case bear out an additional policy and training deficiency that the County has known about for over a decade. Namely, Defendants knew of a long history of subordinates were failing to conduct proper cells checks or failing to follow jail policies regarding care and monitoring of seriously ill inmates, including these prior cases:

a.   In Mr. Sisson's death in 2011, jail deputies failed to check on Mr. Sisson for hours.  Mr. Sisson later died during a drug withdrawal.

b.   In 2012, as Mr. Victorianne laid on the floor of his cell, naked and unconscious, none of the deputies conducted proper security checks, soft counts or hard counts, which requires the deputies to scan the wrist band of each inmate.  One deputy was told by an inmate that Mr. Victorianne was not breathing.  This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched;" and left him to die in his cell. These deputies failed to conduct proper checks then lied about it to investigators.

c.   In 2014, Christopher Carroll, who was mentally ill, was placed in segregation.  He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell.  He had urinated on the floor and food and feces were stuck to the ceiling.  Deputies had failed to conduct proper cell checks to check for his well-being despite Mr. Carroll's known condition.

d.   In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine.  A nurse told this deputy to take Mr. Nunez to Medical.  Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed.  The deputy left Mr. Nunez in his cell to die.

/ / /

/ / /

COMPLAINT                                              CASE NO.

e.  In Mr. NeSmith's case in 2014, a jail deputy saw Mr. NeSmith attempting suicide, but took no action to stop Mr. NeSmith or to call for psychiatric intervention.

f.  In February of 2016, Richard Boulanger hung himself in his cell at the Central Jail.  His cellmate pressed the emergency call button, but no deputy came to the cell for approximately 20 minutes.  A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check.  The investigation revealed that during cell checks, the deputy peered into each cell for approximately one second in violation of policy.  The investigation which followed revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard.

g.  As alleged in a lawsuit against the County stemming from its inadequate medical and supervision policies, the County was "placed on notice, subordinates themselves had notified the County that they were not conducting proper cell checks and that glancing into a cell without breaking stride was routine."

119.  Not only was the County on notice that its staff members were intentionally performing inadequate cell checks, the County actively failed to discipline and train its employees regardless of the ample notice it was provided.

120.  In the case of Mr. Victorianne, the supervisors covered up for their subordinates by interfering with the investigation, preventing Homicide investigators from interviewing the last deputies to see Mr. Victorianne alive.  After his own staff issued a recommendation that certain staff members be reprimanded for lying, Defendant Gore refused to follow it.

121.  When Mr. NeSmith's widow sued the County over his death, she cited to the San Diego CityBeat article titled "60 Dead Inmates" by Kelly Davis, an

37

COMPLAINT                                      CASE NO.

award-winning journalist who exposed the problem of the high death rates in the Jails. San Diego officials then targeted Davis, subpoenaing her to divulge all the information and sources she used for her story, including confidential discussions with attorneys about the wrongful death lawsuits. The County then filed a motion to compel. Instead of addressing the known problems in the Jail, its officials targeted this journalist with the intent to silence any criticism and public attention.

122. Despite well-known problems of deaths and serious injuries from improper monitoring of inmates and failure to render adequate medical care, County officials continued to cover up their subordinates' misconduct.

123. In cases of deaths or serious injuries, there is no policy mandating Internal Affairs investigations of individual deputy conduct to enforce accountability. The NCCHC audit criticized the Sheriff's Department for failing to conduct a formal peer review process for contract medical providers and nurses. Health care providers were not being informed of any results of death reviews ensuring that the medical providers would continue offering constitutionally inadequate medical services.

124. The County has not made any attempt to further train jail staff, to monitor them more closely, or to provide additional supervision and oversight. By failing to discipline, further train, or more closely supervise/monitor its staff, the County ratified their employees' misconduct.

125. In sum, DOE Supervisor Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate screenings and follow-up treatment. As a result, Mr. Gil was ignored for fourteen hours while staff knew he was suffering from medical distress and symptoms associated with early on-set dementia and uncontrolled diabetes. DOE Supervisor Defendants also failed to train and supervise their staff regarding adequate visual safety checks and the need to provide immediate medical care to inmates in medical distress.

COMPLAINT                                    CASE NO.

126.   DOE Supervisors failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

127.   Defendants have a widespread history of ratifying employee misconduct by failing to supervise and discipline their subordinates.

128.   Defendants were aware of long series of untimely and wrongful deaths in the San Diego County Jails from lack of medical care and failed to properly supervise and discipline their employees or agents.

129.   Defendants were aware that their correctional staff were failing to properly monitor the housing units and failing to properly check on the welfare of the inmates.  Defendants were aware that the failure to supervise their employees led to numerous inmate deaths.

130.   Doe supervisors refused to investigate misconduct and/or took no remedial steps or action against deputies and medical staff.

131.   Confronted with information that the misconduct of their subordinates were causing deaths and serious injuries, Defendants refused to implement the recommendations of CLERB (or the State Auditor) to discipline their subordinates.

132.   Instead of disciplining their subordinates, Defendants covered up the misconduct of their staff and contract employees by to ensure that the families of the deceased inmates would not be able to access the courts.

133.   Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical and corrections staff but failed to supervise or discipline them. Many of these supervisors have since left the Sheriff's Department.  Plaintiffs are ignorant of the current DOE Supervisors failing to training and disciple.

134.   There has been an official policy of acquiescence in the wrongful conduct.  Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

COMPLAINT                                    CASE NO.

135.   Defendants, the County and DOE Supervisors, condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

136.   Defendants were, or should have been, aware that the policy regarding training, supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

137.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to Mr. Gil's needs. The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

138.    In committing the acts alleged above, the individual Defendants acted grossly and/or maliciously and/or were guilty of a wanton and reckless disregard for the rights and feelings of all inmates in need of medical assistance and by reason thereof Mr. Gil's heirs are entitled to exemplary and punitive damages in an amount to be proven at trial.

## VIII.

## <u>FOURTH CAUSE OF ACTION</u>

**42 U.S.C. Section 1983 – Due Process – Depravation of Familial Association**

**[By Jennifer Schmidt and Lyndzy Against All Defendants and DOES]**

139.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

140.   The Ninth Circuit recognizes that a parent and child have a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her parent. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

COMPLAINT                                      CASE NO.

141.   All Defendants' failures hereinabove described was so egregious and outrageous it would shock the contemporary conscience of society.

142.   Each Defendant knew Mr. Gil was in medical distress yet ignored him. Defendants walked past Mr. Gil's cell and observed fecal matter all over himself and the cell.  Each Defendant also observed that Mr. Gil was experiencing worsening symptoms of confusion and disorientation.  Each Defendant intentionally ignored Mr. Gil and left him to die in his cell.

143.   Mr. Gil remained isolated, unmonitored, and unmediated, despite displaying signs and symptoms associated with severe medical distress.

144.   These facts equate to conduct that shocks the conscience.  As such the County, Defendant Sauking, and DOES 1-10 are liable for the damages associated with Plaintiffs' loss of relationship.

145.   Jennifer and Lyndze will never get to share another adventure with their father.  They will never get to share the holidays or birthdays together.  For this tragic loss of love and compassion, each Defendant is liable.

## IX.

## <u>FIFTH CAUSE OF ACTION</u>

## **BANE ACT (Civ. Code, §52.1)**

## **(By Jennifer Schmidt, as Successor in Interest Against All Defendants and DOES 1-10)**

146.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

147.   The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment … of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."  (§ 52.1, subd. (a); see id., subd. (b).)  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the

COMPLAINT                                    CASE NO.

plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal.App.4th 860, 883 (2007).

148.   In the Ninth Circuit, as it relates to Bane Act claims relating to inadequate medical care in a correctional setting, controlling law states, with regard to coercive conduct, "at the pleading stage, the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct." *M.H. v. County of Alameda* (N.D. Cal. 2013) 90 F. Supp. 3d 889, 898 Courts have equated the "[t]hreat, intimidation, or coercion" requirement to "intentional . . . conduct." *Id.* at 898.  "That intent requirement is satisfied where the defendant allegedly acted with '[r]eckless disregard of the right at issue.'" *Cornell v. City and County of San Fransisco* (1st Dist. 2017) 17 Cal. App. 5th at 804.

149.   Here, Defendant Silvia Sauking was on notice that Mr. Gil was suffering from severe symptoms associated with early on-set dementia, such as confusion and disorganized thoughts. Defendant Silvia Sauking also knew that Mr. Gil came with discharge orders from PMCED to monitor him for chest pains and palpitations.  Defendant Silvia Sauking was also on notice that Mr. Gil suffered from hypertension and diabetes.  Despite all of this knowledge, Defendant Silvia Sauking intentionally failed to provide any medical treatment or schedule Mr. Gil for further medical treatment.  Conversely, she and DOE Defendants intentionally and wrongfully assumed that Mr. Gil was under the influence, despite her medical experience indicating otherwise.  Based on that unreasonabl and callous assumption, based only on the charges alleged against him, each Defendant housed Mr. Gil in a holding cell and ignored him for fourteen hours until he was found dead in his cell.

/ / /

/ / /

/ / /

42

COMPLAINT                                    CASE NO.

150.   Each Defendant walked past Mr. Gil's cell and observed fecal matter all over himself and the cell.  Each Defendant also observed that Mr. Gil was experiencing worsening symptoms of confusion and disorientation.  Despite this knowledge, each Defendant intentionally ignored Mr. Gil and left him to die in his cell.

151.   Furthermore, each DOE Defendant knew Mr. Gil was in severe medical distress yet intentionally ignored him for fourteen hours, and then failed to endorse Mr. Gil to the on-coming shift, ensuring he would continue to be ignored.

152.   This intentional conduct, knowing Mr. Gil would die without proper treatment, and failing to obtain that treatment, rises to the necessary level of reckless disregard.

153.   Based on the individual Defendants' intentional failure to act as referenced above, the County is vicariously liable.  See *Perreault v. Cty. of Westminister* (C.D. Cal. March 7, 2013) 2013 U.S. Dist. LEXIS 31780 at *7 (recognizing availability of *respondeat superior* liability for violations of Bane Act).

154.   Additionally, the County is directly liable under the Bane Act because it intentionally choose not to train or supervise its staff, as detailed above.

155.   Accordingly, as a result of all Defendants' wrongful conduct, Mr. Gil's successor in interest is entitled to all applicable damages and attorney's fees according to proof and pursuant to Civil Code, section 52.1, as detailed above.

## X.

### <u>SIXTH CAUSE OF ACTION</u>

**Negligence (CCP 377.30)**

**(By Successor in Interest Against All Defendants and DOES 1-10)**

156.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

/ / /

43

COMPLAINT                                    CASE NO.

157.   Defendants had a duty to Mr. Gil to act with ordinary care and prudence so as not to cause harm or injury to another.  Similarly, each Defendant was under a duty to provide for the safety, health, welfare, and medical care of Mr. Gil as he was exclusively under the control and custody of the County.

158.   Medical professionals, like Defendant Silvia Sauking, also have a duty to perform at a standard of care that governs all reasonable medical providers.  As such, at all times referenced herein, Defendant Silvia Sauking and Medical DOES, and each of them, had a duty and were required to exercise the level of skill, knowledge, and care in diagnosis and treatment of Mr. Gil, as other reasonable medical professionals in the community.

159.   Furthermore, California Government Code section 845.6 creates an affirmative duty for jail staff to furnish or obtain immediate medical care for a prisoner in their custody when the jailer knows the inmate is in serious medical distress. See California Government Code section 820(a).

160.   As alleged above, in screening, evaluating, assessing and handling Mr. Gil's medical condition and needs, Defendant Silvia Sauking failed to comply with professional and legal standards.

161.   As alleged above, in assuming Mr. Gil was under the influence without properly assessing and monitoring Mr. Gil, each Defendant failed to comply with professional and legal standards.

162.   As alleged above, in placing Mr. Gil in a single-man holding cell and ignoring him for the next fourteen hours, despite knowing Mr. Gil was in severe medical distress, each Defendant failed to comply with professional and legal standards.

163.   In doing the acts and/or omissions herein alleged, all Defendants failed to summon and/or provide immediate and adequate medical care and therefore was negligent in their individual conduct.

/ / /

COMPLAINT                                    CASE NO.

164.   In doing the acts and/or omissions alleged in the First Cause of Action for Objective Indifference, Defendant Silvia Sauking and all Medical DOES, failed to exercise the level of skill, knowledge, and care in diagnosis and treatment of Mr. Gil by failing to properly screen, assess, evaluate, monitor, and furnish follow-up continuous care. Defendants conduct was a serious and extreme departure from the applicable standards of care.

165.   Based on the intentional and/or negligent acts of each Defendant and DOE Defendant, and pursuant to California Government Code 815.2 and 815.6, the County is vicariously liable for its employees' negligent and reckless conduct which was performed within the course and scope of their employment.

166.   Pursuant to Code of Civil Procedure section 377.34, a plaintiff is entitled to recover "damages for pain, suffering, or disfigurement if the action or proceeding was …filed on or after January 1, 2022, and before January 1, 2026."

167.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Mr. Gil suffered physically and mentally for at least fourteen hours, and then prematurely died.

168.   As detailed above, Defendants' conduct amounts to oppression, fraud, or malice within the meaning of Civil Code Section 3294 et supra.  Accordingly, punitive damages should be assessed against Defendants for the purpose of punishment and for the sake of example.

169.   As such, the damage associated with each Defendants' negligence is to be determined at the time of trial.  Furthermore, Mr. Gil's successor in interest is entitled to all applicable damages available pursuant to the California Government Code which is to be determined at trial.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                          CASE NO.

# XI.

## SEVENTH CAUSE OF ACTION

### Wrongful Death (CCP 377.60)

**[By Jennifer Schmidt and Lyndze Against All Defendants and DOES]**

170.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

171.   At the time of Mr. Gil's death, he had two daughters survive him, Jennifer and Lyndze.  As Mr. Gil's daughters, they have standing to assert a cause of action for their father's wrongful death.  See Cal. Civ. Porc. Code section 377.60.

172.   As alleged in detail above, Mr. Gil died as a result of each Defendants' tortious conduct, to wit, each Defendants' deliberate indifference to Mr. Gil's serious medical needs. Mr. Gil's death was therefore wrongful for purposes of a claim for damages under Cal. Civ. Porc. Code section 377.60. *See Estate of Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013).

173.   Moreover, each Defendant was charged with the duty to act in accordance with the laws of state and the Constitution and to provide treatment in accordance with a reasonable standard of care.  Each have a particularized duty to summon adequate medical care when they are on notice that an inmate is in need of immediate medical care.

174.   As alleged in detail above, the County is liable for Plaintiffs' damages because each Defendant knew Mr. Gil was in need of immediate medical care and denied him that care.  The County is vicariously liable for their employees' tortious conduct.

175.   As a direct and foreseeable result of the conduct alleged above, leading to Mr. Gil's wrongful death, pursuant to California Code of Civil Procedure Section 377.60, Plaintiffs have suffered, economically and non-economically, from the loss of their father.  They have suffered and continue to suffer loss of love, society,

COMPLAINT                                              CASE NO.

companionship, comfort, care, guidance, protection, affection, financial support, moral support, and other services as a result of their father's preventable death.  In addition, the death of father has caused Plaintiffs' extreme emotional turmoil and anguish.

## XII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.      For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount according to proof;

2.      For punitive and exemplary damages against each individually named Defendant in their individual capacity in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3.      For reasonable costs, expenses, and attorney's fees pursuant to 42 U.S.C. section 1988 and 12205, California Civil Code sections 52.1 et seq.; and 1021.5, and as otherwise authorized by statute or law; and

4.      For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## XIII.

## **REQUEST FOR JURY**

Plaintiffs hereby request a jury trial in this action.

Respectfully submitted,

**PHG Law Group**

Dated:  May 16, 2023                    by:    *s/ Danielle R. Pena*
Danielle R. Pena, Esq.
dpena@PHGLawGroup.com
Attorneys for Plaintiffs

COMPLAINT                                    CASE NO.

# EXHIBIT 1

MATTHIAS I. OKOYE, MD.,J.D.
DIRECTOR



6940 VAN DORN STREET
SUITE 105
LINCOLN, NEBRASKA 68506
(402) 486-3447
FAX (402) 486-3477

## NEBRASKA INSTITUTE OF FORENSIC SCIENCES, INC.

NAME:   **GIL, GILBERT GONZALO**
DOB:    1/11/1955
CLIENT: FAMILY REQUESTED AUTOPSY;
        JENNIFER SCHMIDT/MOTHER &
        (ENTERTAINMENT INDUSTRY FOUNDATION, INC.)
REPORT DATE: 3/28/2022

ACCESSION NO.: MLA22-00021
EXPIRATION DATE: 2/14/2022
AUTOPSY DATE: 3/28/2022

## FINAL ANATOMIC DIAGNOSIS

**BODY AS A WHOLE:**
Embalmed, well-developed, obese, male.

**INTERGUMENTARY SYSTEM:**
Early decomposition changes with skin slippage of the forehead and the anterior neck area.
Previous Y-shaped sutured autopsy incisions with sutures.
Scalp incision with sutures.
Two (2) Identification bands around the right ankle are present.
Bilateral stasis dermatitis of the legs and feet.
Dehydration associated with abnormal vitreous fluid electrolytes at first autopsy.

**EVIDENCE OF INJURY:**
MINOR BLUNT FORCE TRAUMA:
A. Small purple contusion of the right upper anterior chest above the nipple (3.0 x 2.0 cm).
B. Small faint purple contusion of the right mid-anterior chest (1.0 x 1.0 cm).
C. Small purple contusion of the lower anterior abdomen (1.0 x 2.0 cm).
D. Small purple contusion of the left groin close to the hip (1.0 x 1.0 cm).
E. Small purple contusion of the back of the left hand (1.0 x 1.0 cm).
F. Small purple contusion of the back of the right upper arm (1.0 x 1.5 cm).
G. Group of small purple contusions of the back of the right elbow (12.0 x 8.0 cm).
H. Two (2) small purple contusions of the back of the right forearm (2.0 x 1.0 cm and 1.0 x 1.0, respectively).
I. Small purple contusion of the anterior aspect of the right thigh (1.0 x 1.0 cm).
J. Group of three (3) purple contusions of the anterior aspect of the right knee (2.0 x 1.0 cm in the respective area).
K. Group of multiple small purple contusions and abrasions of the anterior aspect of the left leg (8.0 x 3.0 cm in circumferential diameter).

**There is no gross evidence of deeply penetrating blunt force trauma or sharp force trauma to the head, neck, trunk or extremities.**

**EVIDENCE OF RECENT MEDICAL INTERVENTION:**
Status post cardiopulmonary resuscitation prior to the first autopsy – rib fractures.

NAME:   **GIL, GILBERT GONZALO**                    ACCESSION NO.: **MLA22-00021**

**MUSCULOSKELETAL SYSTEM:**
Not remarkable.

**RESPIRATORY SYSTEM:**
Marked hyperemia of the larynx, trachea, and bronchi with marked cyanosis of the mucosal membranes.
Bilateral acute hemorrhagic pulmonary edema and congestion, all lobes of both lungs, with:
A. Consolidative changes of the pulmonary parenchyma.
No gross evidence of occlusive thromboemboli of the pulmonary arteries and their branches identified.
No petechial hemorrhages of the visceral pleurae of both lungs are identified.
No gross evidence of tumor or malignancy is identified.

**CARDIOVASCULAR SYSTEM:**
Hypertensive cardiovascular disease with cardiomegaly (Heart weight, 410 gms at first autopsy).

**HEMIC SYSTEM:**
Marked autolysis is present.

**GASTROINTESTINAL SYSTEM:**
Diffuse mixed microvesicular and macrovesicular steatosis.

**GENITOURINARY SYSTEM:**
Bilateral nephroarteriosclerosis and nephroarteriosclerosis.

**ENDOCRINE SYSTEM:**
Clinical diabetes mellitus with dehydration.

**CENTRAL NERVOUS SYSTEM:**
Early acute cerebral edema and decomposition of the brain.
No scalp, subdural, or subarachnoid hemorrhages are identified.
No skull fractures are identified.

**ORGANS OF SPECIAL SENSE(S):**
EYES:     Not remarkable.
EARS:     Not remarkable.

**TOXICOLOGY:**
Liver tissue is submitted to the Department of Forensic Toxicology, St. Louis University School of Medicine, St. Louis, Missouri, for comprehensive toxicology.  Refer to the Toxicology Report attached herewith.  Refer tot the Toxicology Report from the first autopsy.

NAME:   **GIL, GILBERT GONZALO**                    ACCESSION NO.: **MLA22-00021**

**OTHER TESTS:**
Covid-19 Test(s) performed prior to the first autopsy at the San Diego County Office of the Medical Examiner, San Diego, CA are positive.

**X-RAYS:**
None requested at the Second Autopsy.

## SUMMARY

In view of the clinical history and the scant police investigative report, and the autopsy findings, the cause is hypertensive cardiovascular disease with cardiomegaly. The other conditions include: clinical diabetes mellitus with complications and hepatic steatosis and COVID-19 virus infection and multiple blunt force trauma.

MIO/MIO
D: 3/28/2022
T: 3/28/2022

Matthias I. Okoye, M.D., J.D.
Director

Page 1 of 4
2022-1161



# SLUCare®
### Physician Group

## St. Louis University Forensic Toxicology Laboratory

## Report of Forensic Toxicology Analysis

| | | | |
|---|---|---|---|
| **Client:** | Nebraska Institute of Forensic Sciences | **Name** | Gil, Gilbert |
| **Requested by:** | Matthias Okoye | **DOB:** | 01/11/1955 |
| **Client Case Number** | MLA22-21 | **Gender:** | M |
| **SLU Tox Number:** | 2022-1161 | **Report Issued:** | 5/2/2022 |
| **Request Number:** | 0001 | | |
| **Specimens Received:** | 04/11/2022  1:08 pm | | |

**POSITIVE RESULTS**

| Specimen | Compound | Result | Units | Analytic Method |
|---|---|---|---|---|
| 001.001 | Ethanol | 0.040 | g% | GC-FID |
| 001.001 | Isopropanol | Confirmed Present | | GC-FID |
| 001.001 | Methanol | Confirmed Present | | GC-FID |

| SLUTOX ID | Specimen Description | Comment |
|---|---|---|
| 001.001 | Liver 20g plain bottle | |
| 001.002 | Embalming Fluid 5.5mL red top tube | |
| 001.003 | Embalming Fluid 5mL red top tube | |

Report Certified By:

*Sarah Riley*

Sarah Riley, PHD, DABCC, DABTC, Director

**Reference Comments:**

**Specimen Source    Analysis Performed**

6059 N. Hanley Rd. Berkeley MO 63134
Telephone: 314-615-0822 Fax: 314-521-1478
Director: Sarah B. Riley, Ph.D., DABCC

Accredited College of American Pathologists

# EXHIBIT 2

1  Danielle R. Pena, Esq., SBN 286002
   dpena@PHGLawGroup.com
2  PHG Law Group
   501 West Broadway, Suite 1480
3  San Diego, CA 92101
   Telephone:  (619) 826-8060
4  Facsimile:   (619) 826-8065

5  Attorneys for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  JENNIFER SCHMIDT, Individually,        Case No.
    and as Successor in Interest to
12  GILBERT GONZALO GIL, and               **DECLARATION OF JENNIFER
    LYNDZY BIONDO, Individually.           SCHMIDT PURSUANT TO
13                                         CALIFORNIA CODE OF CIVIL
                        Plaintiff,         PROCEDURE SECTION 377.32**
14
15         v.

16  COUNTY OF SAN DIEGO, SILVIA
    SAUKING, an individual, AND
17  DOES 1-10, inclusive,

18                      Defendants.

19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
DECLARATION OF JENNIFER SCHMIDT        CASE NO.

I, Jennifer Schmidt, submit this declaration pursuant to California Code of Civil Procedure section 377.32 as decedent's successor in interest and hereby declare as follows:

1.   JENNIFER SCHMIDT is the decedent, GILBERT GONZALO GIL'S, daughter.  GILBERT GONZALO GIL was found dead at Vista Detention Facility on February 14, 2022.

2.   No proceeding is now pending in California for administration of GILBERT GONZALO GIL'S ESTATE.

3.   JENNIFER SCHMIDT is GILBERT GONZALO GIL'S Successor in Interest and succeeds his interest in this action pursuant to California Code of Civil Procedure sections 377.01, 377.11, and California Probate Code section 6402.

4.   GILBERT GONZALO GIL was survived by two daughters, Jennifer Schmidt and Lyndzy Biondo.

5.   No other person has a superior right to commence the above-entitled proceeding or to be a substituted for successor in interest in the above-entitled proceeding.

6.   Attached as Exhibit 1 is a true and correct copy of the death certificate for GILBERT GONZALO GIL.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  05 / 16 / 2023 _____

_____
Jennifer Schmidt

2

# EXHIBIT 1

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

**CERTIFICATE OF DEATH**

STATE OF CALIFORNIA

USE BLACK INK ONLY / NO ERASURES, WHITE OUTS OR ALTERATIONS
VS-11 (REV 3/96)

STATE FILE NUMBER     LOCAL REGISTRATION NUMBER     3202237004977

| | | |
|---|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) **GILBERT** | 2. MIDDLE **GONZALO** | 3. LAST (Family) **GIL** |

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST)

| | | | | |
|---|---|---|---|---|
| 4. DATE OF BIRTH mm/dd/ccyy **01/11/1955** | 5. AGE YRS **67** | IF UNDER ONE YEAR / IF UNDER 24 HOURS Months Days Hours Minutes | 6. SEX **M** | |
| | 7. DATE OF DEATH mm/dd/ccyy **02/14/2022 FND** | | 8. HOUR (24 Hours) **1840** | |

| | | | |
|---|---|---|---|
| 9. BIRTH STATE/FOREIGN COUNTRY **CA** | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? YES ☒ NO ☐ UNK | 12. MARITAL STATUS/SRDP at time of death **DIVORCED** |
| 13. EDUCATION – Highest Level/Degree **PROFESSIONAL** | 14/15. WAS DECEDENT HISPANIC/LATINO/A/SPANISH? (check one or both) ☒ YES ☐ NO **MEXICAN** | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) **MEXICAN** | 19. YEARS IN OCCUPATION **50** |
| 17. USUAL OCCUPATION – Type of work for most of life, DO NOT USE RETIRED **MASTER MECHANIC** | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) **AUTO** | | |

| | | | |
|---|---|---|---|
| 20. DECEDENT'S RESIDENCE (Street and number or location) **975 DEL DIOS HWY 211** | | | |
| 21. CITY **ESCONDIDO** | 22. COUNTY/PROVINCE **SAN DIEGO** | 23. ZIP CODE **92029** | 24. YEARS IN COUNTY **67**   25. STATE/FOREIGN COUNTRY **CA** |

| | |
|---|---|
| 26. INFORMANT'S NAME, RELATIONSHIP **JENNIFER ELIZABETH SCHMIDT, DAUGHTER** | 27. INFORMANT'S MAILING ADDRESS (Street and number or rural route number, city or town, state and zip) **1580 SHADOWRIDGE DR 191, VISTA, CA 92081** |

| | | | |
|---|---|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST - | 29. MIDDLE - | 30. LAST (BIRTH NAME) - | |
| 31. NAME OF FATHER/PARENT—FIRST **GONZALO** | 32. MIDDLE - | 33. LAST **PALACIO** | 34. BIRTH STATE **JAL, MX** |
| 35. NAME OF MOTHER/PARENT—FIRST **AUROVA** | 36. MIDDLE - | 37. LAST (BIRTH NAME) **GOMEZ** | 38. BIRTH STATE **CA** |

| | | |
|---|---|---|
| 39. DISPOSITION DATE mm/dd/ccyy **03/14/2022** | 40. PLACE OF FINAL DISPOSITION **RES JENNIFER SCHMIDT 1580 SHADOWRIDGE DR 191, VISTA, CA 92081** | |
| 41. TYPE OF DISPOSITION(S) **CREMATE/RESIDENCE** | 42. SIGNATURE OF EMBALMER ▶ **NOT EMBALMED** | 43. LICENSE NUMBER |
| 44. NAME OF FUNERAL ESTABLISHMENT **NORTH COUNTY CREMATION SERVICE** | 45. LICENSE NUMBER **FD1463** | 46. SIGNATURE OF LOCAL REGISTRAR ▶ **WILMA WOOTEN MD**   47. DATE mm/dd/ccyy **03/09/2022** |

| | | |
|---|---|---|
| 101. PLACE OF DEATH **DETENTION FACILITY** | 102. IF HOSPITAL, SPECIFY ONE ☐ IP ☐ ER/OP ☐ DOA   103. IF OTHER THAN HOSPITAL, SPECIFY ONE ☐ Hospice ☐ Nursing Home/LTC ☐ Decedent's Home ☒ Other | |
| 104. COUNTY **SAN DIEGO** | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location) **325 S. MELROSE DRIVE** | 106. CITY **VISTA** |
| 107. CAUSE OF DEATH | Enter the chain of events — diseases, injuries, or complications — that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Time Interval Between Onset and Death |
| IMMEDIATE CAUSE (A) **PENDING** | | 108. DEATH REPORTED TO CORONER? ☒ YES ☐ NO |
| | | 108A. **22-00626** |
| | | 109. BIOPSY PERFORMED? ☐ YES ☒ NO |
| | | 110. AUTOPSY PERFORMED? ☒ YES ☐ NO |
| | | 111. USED IN DETERMINING CAUSE? ☒ YES ☐ NO |

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107

113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if yes, list type of operation and date) **UNK**    113A. IF FEMALE, PREGNANT IN LAST YEAR? ☐ YES ☒ NO ☐ UNK

| | |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. Deceased Attended Since mm/dd/ccyy   Deceased Last Seen Alive mm/dd/ccyy | 115. SIGNATURE AND TITLE OF CERTIFIER ▶    116. LICENSE NUMBER   117. DATE mm/dd/ccyy |
| | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE |

| | | |
|---|---|---|
| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH ☐ Natural ☐ Accident ☐ Suicide ☐ Homicide ☒ Pending Investigation ☐ Could not be Determined | 120. INJURED AT WORK? ☐ YES ☐ NO ☐ UNK | 121. INJURY DATE mm/dd/ccyy   122. HOUR (24 Hours) |
| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) | | |
| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | |
| 125. LOCATION OF INJURY (Street and number or location, and city, and zip) | | |

| | | |
|---|---|---|
| 126. SIGNATURE OF CORONER / DEPUTY CORONER ▶ **BETHANN SCHABER** | 127. DATE mm/dd/ccyy **02/17/2022** | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER **BETHANN SCHABER, DME** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| STATE REGISTRAR | A | B | C | D | E | FAX AUTH.# | CENSUS TRACT |

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

DATE ISSUED: 3/18/2022   WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego



A004035007

**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**