1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

JENNIFER SCHMIDT, et al.,

12

Plaintiffs,

13

v.

14

COUNTY OF SAN DIEGO, et al.,

15

Defendants.

Case No.:  23-cv-0899-W-DDL

**ORDER DENYING IN PART AND GRANTING IN PART WITHOUT LEAVE TO AMEND DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT [DOC. 18]**

16
17
18
19
20

Pending before the Court is Defendant County of San Diego and Silva Suaking's motion to dismiss the Second Amended Complaint ("SAC" [Doc. 16]) under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs Jennifer Schmidt and Lyndzy Biondo oppose.

21
22
23

The Court decides the matter on the papers submitted and without oral argument. *See* Civ.L.R. 7.1(d)(1).  For the following reasons, the Court **DENIES IN PART** and **GRANTS IN PART** without leave to amend the motion to dismiss [Doc. 18].

24
25

## I.   FACTUAL BACKGROUND

26

Most of the following factual allegations are taken verbatim from the SAC.

27

On February 12, 2022, Gilbert Gonzalo Gil, crashed his truck in a ditch in

28

Escondido, California. (*SAC* ¶ 37.) Mr. Gil was 67 and suffering from confusion

1

associated with early on-set dementia. (*Id.*) The California Highway Patrol ("CHP") found Mr. Gil inside the truck. (*Id.* ¶ 38.) The SAC alleges that it is unknown at this time if Mr. Gil was under the influence based on alleged statements he made; however, CHP arrested him for being under the influence. (*Id.*)

At approximately the same time, Mr. Gil's daughter, Plaintiff Jennifer Schmidt, noticed that her father had not come over as he did every night. (*SAC* ¶ 39.)  Jennifer checked an app on her phone and discovered that her father had been in a car accident. (*Id.*) Jennifer got in her car and drove to the scene and when she arrived, Mr. Gil was being placed in the back of a patrol car. (*Id.*) Jennifer asked officers what was happening and she was told that Mr. Gil was being arrested for being under the influence. (*Id.*)

Jennifer noticed that her father was showing signs of thought disorganization, nonsensical communication, altered mental status, and confusion and she informed the CHP officers that these symptoms were associated with early on-set dementia and uncontrolled diabetes. (*SAC* ¶ 40.) The officers arrested Mr. Gil and transported him to the Vista Detention Facility ("VDF"). (*Id.* ¶ 41.) It is unknown whether the officers informed VDF intake staff that Mr. Gil was suffering from early on-set dementia and diabetes. (*Id.*) Mr. Gil was placed in a holding cell that night. (*Id.*)

Early the next morning, Jennifer contacted the CHP to determine Mr. Gil's whereabouts. (*SAC* ¶ 42.) Jennifer was informed that he had been booked into VDF as a book and release. (*Id.*) Jennifer checked the Sheriff's website and noticed that Mr. Gil was on the release cue. (*Id.*) Inmates on the release que are usually released between 7:00 a.m. and 9:00 a.m. (*Id.*) Because Mr. Gil had not been released by 9:00 a.m., Jennifer called the jail to inquire about her father and was told by a jail employee that Mr. Gil was supposed to be released. (*Id.*) The employee then placed Jennifer on hold and transferred her to the medical services division. (*Id.*)

An unknown medical nurse told Jennifer that Mr. Gil was in a book and release cell but was not "sobering up" so she was not sure when he would be released. (*SAC* ¶ 43.) In response, Jennifer said that Mr. Gil was suffering from symptoms of early on-set

dementia and uncontrolled diabetes and, therefore, "He's not going to sober up, he's sick. This is not a drug issue." (*Id.*) The medical employee told Jennifer she would call her back after speaking to her supervisor. (*Id.*) A minute later, the employee called Jennifer and told her to meet in the lobby and they would release Mr. Gil into her custody. (*Id.*)

Jennifer immediately picked up Mr. Gil and signed for his property paperwork because he was physically incapable. (*SAC* ¶ 44.) Jennifer then took Mr. Gil to his home to eat and sleep, hoping that would help calm him. (*Id.*) However, later that night, Mr. Gil again exhibited bizarre behavior indicating severe confusion and distress. (*Id.*) A family member called 911 and Escondido Police were dispatched to the home. (*Id.*) The police were led to Mr. Gil's bedroom and arrested him for being under the influence. (*Id.*)

Before transporting Mr. Gil to VDF, at 11:30 p.m., Mr. Gil was taken to Palomar Medical Center Emergency Department ("PMCED") to determine if he was medically cleared to be detained. (*SAC* ¶ 45.) Due to Mr. Gil's severe medical distress, he was not capable of consenting to medical treatment. (*Id.*) The PMCED doctor informed Escondido Officer Donaghy that "based on a visual examination, Mr. Gil appears medically safe to detain … however, additional tests should be performed." (*Id.*) The doctor also stated Mr. Gil needed to be brought back to PMCED if he started experiencing "chest pain or palpitations." (*Id.*) The doctor filled out a discharge form to that effect, which Officer Donaghy provided to Defendant Silva Suaking, the medical intake nurse at VDF. (*Id.*)

During the intake process, Mr. Gil continued to display thought disorganization, nonsensical communication, altered mental status, and confusion, which the SAC alleges are signs and symptoms associated with early on-set dementia and uncontrolled diabetes. (*SAC* ¶ 47.) The intake paperwork also indicates that Defendant Nurse Suaking knew Mr. Gil suffered from hypertension and diabetes mellitus, yet Nurse Suaking failed to implement a medical treatment plan or follow-up plan relating to Mr. Gil's hypertension. (*Id.* ¶¶ 47, 48.) Instead, Nurse Suaking simply performed a glucose test, which came back elevated at 253, and then administered 5 units of insulin to Mr. Gil, per the operative

Standard Nursing Procedure ("SNP"). (*Id.* ¶ 48.) The SAC alleges that according to San Diego County's diabetes SNP, Mr. Gil was to have his glucose levels checked at least three times a day, but the limited medical records indicate that Nurse Suaking did not order follow-up glucose testing. (*Id.*) Nurse Suaking's medical entry also indicates she did not communicate or educate Mr. Gil on his glucose levels because Mr. Gil was too unstable at the time. (*Id.*) Nurse Suaking also failed to input the medical flags into Mr. Gil's Electronic Medical Record and did not order a nursing follow-up as mandated by county policy. (*Id.*)

During the intake evaluation, Nurse Suaking read the discharge instructions from PMCED and was put on notice that Mr. Gil did not undergo a medical clearance at PMCED because he could not consent to medical treatment due to the level of his medical distress. (*SAC* ¶ 49.) Nurse Suaking also knew that the PMCED doctor ordered Mr. Gil to be monitored for "chest pain and palpitations," and to be brought back to PMCED if those symptoms occurred. (*Id.*) Nevertheless, Nurse Suaking failed to implement a directive to monitor Mr. Gil for chest pains and palpitations. (*Id.*)

Less than an hour later, during the booking process, Mr. Gil lost his balance and fell. (*SAC* ¶ 50.) Unknown deputies then placed Mr. Gil in a wheelchair to prevent him from falling again. (*Id.*) According to the San Diego Medical Examiner's report, unknown deputies had a difficult time processing Mr. Gil due to him being "under the influence." (*Id.*) Based on their "wrong and unreasonable assumption that Mr. Gil was 'heavily' under the influence, and in disregard of the PMCED discharge instructions, Defendants Suaking, DOE nurses, and DOE Deputies made the decision to place Mr. Gil in a holding cell to 'sober up' without conducting further medical assessments and without ensuring Mr. Gil would be monitored for chest pains, palpitations, and high glucose levels." (*Id.*)

Mr. Gil was placed in the holding cell, alone, at 3:44 a.m., and ignored for the next 14 hours.  (*SAC* ¶ 51.) At some point, Nurse Suaking left her shift without endorsing Mr. Gil to the follow-on shift, ensuring that Mr. Gil would continue to be ignored by the

4

medical staff. (*Id.* ¶ 52.) At 8:34 a.m., five hours after being placed in the holding cell, Mr. Gil removed his pants and defecated all over himself and the cell, and fell on his side in front of the cell door. (*Id.* ¶ 53.) For the next nine and a half hours, no one checked on Mr. Gil. (*Id.*) An hour before he was discovered, at 5:21 p.m., Mr. Gil stopped moving and was unresponsive, lying on the floor of the cell. (*Id.*) Two minutes later, a DOE deputy looked into the cell and left. (*Id.*) At 6:03 p.m., Mr. Gil was discovered dead and cold to the touch. (*Id.* ¶ 54.)

On May 16, 2023, Plaintiffs Jennifer Schmidt and Lyndzy Biondo filed this lawsuit against the County of San Diego, Nurse Suaking and various Doe sheriff deputies, nurses and supervisors. On August 28, 2023, Plaintiffs filed the First Amended Complaint ("FAC"), charging the County and other defendants with deliberate indifference to Mr. Gil's serious medical needs and asserting three federal causes of action for violation of 42 U.S.C. § 1983 and four state-based causes of action. Defendants moved to dismiss the FAC arguing, among other things, that Plaintiffs lacked standing.

On December 20, 2023, this Court granted the motion to dismiss with leave to amend finding that Plaintiffs lacked standing because they failed to provide any facts supporting the contention that Mr. Gil was Plaintiffs' "natural parent" under California Probate Code § 6453. Because Plaintiffs failed to establish standing, the Court did not reach the other issues raised in the motion to dismiss.

On January 10, 2024, Plaintiffs filed the SAC and on January 11, 2024 Jennifer Schmidt filed another declaration in support of their contention that they have standing because Mr. Gil was their "natural parent." Defendants responded by filing the pending motion to dismiss that again challenges Plaintiffs' standing. In addition, Defendants argue the federal causes of action should be dismissed because (1) each defendant is entitled to qualified immunity, (2) the claims against "DOE" defendants fail to satisfy the pleading requirements, (3) the first claim for relief as to Nurse Suaking fails to plead objective indifference, and (4) the second claim for relief for inadequate policies fails to identify an official, formal policy. Defendants also argue the state causes of action should

5

be dismissed for failure to state a claim, and that punitive damages cannot be sought against the County. Plaintiffs oppose the motion.

## II.   LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party."  *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Although well-pled allegations are assumed true, a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## III.   DISCUSSION

### A.   Standing

Defendants argue Plaintiffs lack standing to pursue the federal causes of action on behalf of Mr. Gil because they are not the representative or successor in interest to his

estate under California's survival statute, Code of Civil Procedure § 377.32.  (*P&A* [Doc. 18-1] 4:23–5:2.)  Defendants further argue that Mr. Gil's biological brother is his successor in interest with a superior right to commence the action.  (*Id.* 6:1–15.)

Plaintiffs respond that they have standing because Mr. Gil was their "natural parent" under California Probate Code § 6453.  (*Opp'n* [Doc. 19] 6:3–15.)  In support of this contention, Plaintiffs rely on Plaintiff Jennifer Schmidt's declaration filed after the SAC.  (*Id.* 8:20–9:16, citing *Schmidt Decl.* [Doc. 17].)  Defendants' reply argues, in essence, that the new facts in Plaintiff Schmidt's declaration fail to establish Mr. Gil was Plaintiffs' "natural parent."  (*Reply* [Doc. 20] 1:12–14.)

"The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action."  *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998) (citing *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir.1998)).  Under California law, a survival action "passes to the decedent's successor in interest . . . and any action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."  Cal. Code Civ. Proc. § 377.30.  The person seeking to file an action as the decedent's successor in interest must file an affidavit that includes facts supporting the contention. *Id.* § 377.32(a).

California Probate Code § 6402(a) provides that "[w]hen there is no surviving spouse, the intestate share of the estate passes to the issue of the decedent." The "issue of a decedent" may include "natural children." *See A.G. v. County of L.A.*, 28 Cal. App. 5th 373, 380 (2018) ("In no event, however, does [the court] stand for the proposition that defendants assert, that only a biological child can be the issue of the decedent"). "Probate Code Section 6450, which applies in situations like the one presented to this court, where the decedent dies intestate, provides that the relationship of parent and child exists 'between a person and the person's natural parents.'" *Id.* at 377.

Plaintiffs argue they have standing under California Probate Code § 6453, which defines a "natural parent."  (*Opp'n* 6:13–15, 8:10–11:8.)  Subsection (a) of that section

provides that "a natural parent and child relationship is established where the relationship is presumed and not rebutted pursuant to the Uniform Parentage Act," commencing with Section 7600 of the Family Code.  Cal. Prob. Code § 6453(a).  Under Family Code § 7601(a), a "'natural parent' means a nonadoptive parent established under this part, whether biologically related to the child or not."  Section 7611(d), entitled "Presumption of Parentage," then provides that a person is presumed a natural parent of a child "if the presumed parent receives the child into their home and openly holds out the child as their natural child."  Cal. Fam. Code § 7611(d).

As set forth in this Court's previous order, California cases evaluating whether a person is the presumed natural parent of a child under section 7611(d) apply the following standard: "receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, but it need not be for any specific duration."  *Jason P. v. Daniell S.*, 9 Cal. App. 5th 1000, 1022 (2017) (quoting *Charisma R. v. Kristina S.*, 715 Cal. App. 4th 361, 374 (2009)).  "A party seeking to establish he is a presumed parent is not required to show that he acted as a parent to the child for a specific period."  *Id.* at 1021.  In making this determination, courts look at the parent's conduct in relation to the child.

In *Jason P.*, 9 Cal. App. 5th 1000, the court held the following conduct established the father was the child's "natural parent." The child regularly spent time in the father's apartment; the father made arrangements to accommodate the child during visits; the father took the child to the park, fed the child, played music for and read to the child; the father arranged for the child to see a doctor; the child had a designated room in the father's apartment; the father toured the child's first school; the father signed the child's school enrollment forms; and the father made a tuition payment.  *Id.* at 1022–23.

In *Wehsener v. Jernigan*, 86 Cal. App. 5th 1311 (2022), the court held the following facts supported the trial court's finding that Charles and Frances Bloodgood, the non-biological parents of Judy, were her "natural parents." After Judy was abandoned at age two by her biological parents, Charles and Frances took her into their home; Judy

8

lived in the home for the duration of her childhood; when Judy was 11, they all moved to another state; Judy was registered with the "Bloodgood" last name on school records; Charles and Frances were listed as Judy's parents on her marriage certificate; in Charles' obituary, Judy was listed as his daughter and her two children as his grandchildren; in Charles' will, Judy was referred to as his daughter and was to inherit all of his property; and Judy's death certificate listed Charles as her father. *Id.* at 1315–16.

Here, Plaintiff Schmidt's declaration contains sufficient facts establishing that Mr. Gill received Plaintiffs into his home. Similar to the facts that supported a finding of natural parentage in *Jason P.* and *Wehsener*, Plaintiff Schmidt's uncontested declaration states that Mr. Gil enrolled Plaintiffs in primary and middle school, often packed their lunches in the morning before school, and they used the "Gil" name until the second grade. (*Schmidt Decl.* ¶ 5.) He also bought Plaintiffs' clothes, shoes, food and school supplies. (*Id.* ¶ 7.) Mr. Gil often took Plaintiffs to "sports practice, such as swimming lessons and the YMCA." (*Id.* ¶ 6.) He also took Plaintiffs to Disneyland, the zoo, wrestle mania, concerts, car shows, and to the roller rink every weekend. (*Id.*) Plaintiff Schmidt contends that while their mother would arrange for routine doctor/dentist appointments, Mr. Gil "would always transport us to the doctor's office and pick up any prescription medications." (*Id.* ¶ 8.)

Although Plaintiffs' mother and Mr. Gil divorced in 1987, Plaintiff Schmidt continued to live with Mr. Gil for an unspecified amount of time. (*Schmidt Decl.* ¶ 4.) When Plaintiffs turned 16 years of age, Mr. Gil purchased each of them a car. (*Id.* ¶ 9.) Plaintiff Schmidt states that Mr. Gill attended her high school graduation, was present at the hospital when each Plaintiff had their first-born child, and he was present during the "birth of all of [Plaintiff Schmidt's] children." (*Id.* ¶¶ 10, 11.) Mr. Gil also carried photos of Plaintiffs in his wallet, and Plaintiff Schmidt was listed as Mr. Gil's daughter on his death certificate. (*Id.* ¶ 14.)

The Court finds the facts in Plaintiff Schmidt's declaration constitute clear and convincing evidence that Mr. Gil "receive[d] the child[ren] into [his] home and openly

h[eld] out the child[ren] as their natural child[ren]." *See* Cal. Fam. Code § 7611(d). Additionally, Defendants offer no rebuttal to the presumption of parentage under Section 7611, which may only be rebutted by clear and convincing evidence. Cal. Fam. Code § 7612(a); *Wehsener*, 86 Cal. App. 5th at 1324. Defendants have not presented any evidence, other than pointing to the lack of biological kinship. (*See P&A* 4:23–10:7.) As set forth above, a lack of biological kinship does not defeat Plaintiffs' standing. *See A.G.*, 28 Cal. App. 5th at 378 (finding that the presumption of parentage was unrebutted when the defendant only asserted a lack of biology in response).

Turning to Defendants' argument that Mr. Gil's brother has a "superior interest," Plaintiffs do not dispute that Mr. Gil's brother is a successor in interest.  However, California Code of Civil Procedure 377.32(a)(6) requires that "no other person has a *superior right* [to the successor in interest who seeks to commence the action] to commence the action or proceeding." *Id.* (emphasis added). And while Defendants argue a biological relative has a superior interest Plaintiffs, Defendants fail to cite any authority supporting that claim.

Moreover, given this Court's finding that Mr. Gil is Plaintiffs' "natural parent," under California law they have a superior interest to Mr. Gil's brother. "The *heirs* of a person are those whom the law appoints to succeed at the decedent's death to his or her estate in case of intestacy, by the virtue of the statutes of succession." *Estate of Britel*, 236 Cal. App. 4th 127, 135 (2015).  Under the law of intestate succession, the estate first passes to "the issue of the decedent," then to "the decedent's parents" if there is no surviving issue, and then thirdly to the "issue of the parents or either of them" if there is no surviving issue or parent.  Cal. Prob. Code § 6402.  Mr. Gil's brother is the issue of Mr. Gil's parents and would fall third in the line of intestate succession.  In contrast, because Mr. Gil is Plaintiffs' natural parent, Plaintiffs are his issue:

> The "issue" of a person is defined as 'all [of] his or her lineal descendants of all generations, with the *relationship* of parent and child at each generation being determined by the definitions of *child* and *parent*. (Prob. Code, § 50, italics added.)  "The relationship of parent and child exists between a person

10

and the person's natural parents."  Cal. Prob. Code § 6450. "Child" means
"any individual entitled to take as a child under this code by intestate
succession from the parent whose relationship is involved." (*Id.*, § 26.)
"Parent" is defined as "any individual entitled to take as a parent under this
code by intestate succession from the child whose relationship is involved."
(*Id.*, § 54.)

"[A] *relationship of parent and child* exists between a person and the
person's *natural parents*, regardless of the marital status of the natural
parents." (Prob. Code, § 6450, subd. (a), italics added.) "Natural parent" is
defined by Probate Code section 6453.

*A.G.*, 28 Cal. App. 5th at 379 (evaluating "natural parent" issue in the context of the
biological father). Because Plaintiffs are considered Mr. Gil's issue, they fall first in the
line of intestate succession and have a "superior interest" to Mr. Gil's brother.
Accordingly, Defendants' argument lacks merit.

### B.   Qualified Immunity

Defendants argue they are entitled to qualified immunity because the SAC fails to
allege a constitutional violation against Nurse Suaking and the Doe Defendants. (*P&A*
11:10–11.)  Defendants also argue that even if a constitutional violation is alleged, the
law was not clearly established because Plaintiffs cannot identify "a case where an
individual plaintiff presented (as Plaintiffs allege) clear signs of medical distress due to
diabetes and hypertension, but where the individual to whom medical attention was
provided was misdiagnosed as being under the influence of methamphetamine." (*Id.*
11:17–21.) Based on the SAC's allegations, these arguments lack merit.

Qualified immunity shields government officials from liability for monetary
damages unless the plaintiff establishes that (1) the conduct violated a constitutional
right, and (2) the right was "clearly established" when the misconduct occurred. *Pearson*
*v. Callahan*, 555 U.S. 223, 232, 236–42 (2009) (modifying the two-step inquiry in
*Saucier v. Katz*, 533 U.S. 194 (2001), to allow courts discretion in deciding which prong
to address first depending on the facts of the case). "Clearly established" means "[t]he

11

contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right" with careful consideration to the facts of the particular case. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

In *Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021), the widow of Ronnie Sandoval, a pretrial detainee who died from a methamphetamine overdose while in a San Diego County jail, sued the County, jail officials and medical staff under 42 U.S.C. § 1983 for violating Sandoval's Fourteenth Amendment right to adequate medical care. Sandoval was arrested after deputies searched his residence and found methamphetamine and drug paraphernalia.  Unbeknownst to the deputies, Sandoval had swallowed an additional amount of the drug to prevent its discovery. At the jail, deputies noticed Sandoval was sweating and appeared disoriented and lethargic. An hour later when Sandoval was taken for his booking photograph, deputies noticed he was sweating and appeared tired and disoriented. Sandoval also said he was cold but refused to say if he swallowed anything. Sandoval was, therefore, taken to a medical station for evaluation.

The deputy informed nurse de Guzman about his observations and stated that Sandoval needed to be "thoroughly" looked at. *Id.* at 662. Sandoval was then placed in a medical observation cell. *Id.* Shortly thereafter, at approximately 5:00 p.m., de Guzman and another deputy entered the cell and noticed Sandoval "shaking mildly" and appearing to be having withdrawals from drugs. *Id.* Nurse de Guzman gave Sandoval a blood sugar test, which came back normal. *Id.* at 663. Sandoval was then left alone and unmonitored. Approximately 8 hours later, as a deputy walked passed Sandoval's cell, the deputy noticed Sandoval's eyes "'weren't tracking' and that his skin tone 'wasn't fleshy color.'"

12

*Id.* As the deputy observed Sandoval, his eyes rolled back in his head. *Id.* The deputy turned to call for help and when he turned back, he saw Sandoval's head hit the wall and he slid to the floor. *Id.*

The deputy and others entered Sandoval's cell and observed "seizure-like activity." *Id.* Deputies told the nurse to call paramedics, but the nurse refused and instead called EMTs, who are not able to provide the same level of life-saving care as paramedics. *Id.* at 663–64. When the EMTs arrived, they could not transport Sandoval in his condition, so paramedics were finally called. *Id.* at 664. Paramedics arrived 47 minutes after Sandoval was first observed to be unresponsive. *Id.* While being transferred to the gurney, Sandoval lost his pulse and was pronounced dead after resuscitation efforts failed. *Id.*

In the lawsuit that followed, defendants moved for summary judgment arguing that they were entitled to qualified immunity. The district court agreed and granted the motion. The Ninth Circuit's decision reversing the district court began by clarifying the test for evaluating whether a pretrial detainee's Fourteenth Amendment right to adequate medical care was violated:

> Under [the] standard, pretrial detainees alleging that jail officials failed to provide constitutionally adequate medical care must show:
>
> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.
>
> [*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).] To satisfy the third element, the plaintiff must show that the defendant's actions

23-cv-0899-W-DDL

were ''objectively unreasonable,'' which requires a showing of ''more than negligence but less than subjective intent—something akin to reckless disregard.'' *Id*. (quoting [*Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)]).

*Id.* at 669. The court then turned to evaluate whether under established case law, a reasonable nurse knowing what de Guzman knew, would have understood that "failing to check on Sandoval for hours and failing to pass on information about his condition . . . , 'presented a substantial risk of harm to [Sandoval] that the failure to act was unconstitutional.'" *Id.* at 678 (bracket in original) (citing *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019)).

The court first found that a reasonable nurse who "was told that Sandoval was sweating, tired and disoriented, and that 'there was still something going on' that needed to be 'look[ed] at . . . more thoroughly'—would understand that Sandoval faced a substantial risk of harm." *Id.* at 679. Based on this finding, the court stated:

> The question thus becomes whether every reasonable nurse would understand, in light of established case law, that de Guzman violated Sandoval's constitutional right to adequate medical care when he responded by merely performing a 10-second blood sugar test—a test performed earlier to no avail— and then walking away, leaving Sandoval unattended for six hours despite the fact that he was only 20 feet from de Guzman's nursing station.

*Id.*

In holding that de Guzman's "minimal course of treatment" violated Sandoval's constitutional right to adequate medical treatment, the court explained that "[o]ur cases make clear that prison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment" or when "prison officials choose a course of treatment that is 'medically unacceptable under the circumstances.'" *Id.* (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) and *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)). Under this standard, the court previously held "correctional officers could be liable for failing to provide constitutionally adequate medical care when they

14

knew that inmates had been exposed to pepper spray but wait[ed] four hours before allowing them to leave their cells to shower," *Clement v. Gomez*, 298 F.3d 898, 902, 904–05 (9th Cir. 2002), and that a "doctor could be held liable for a constitutional violation when he knew that an inmate's thumb was fractured but failed to ensure that the fracture was set and cast," *Jett*, 439 F.3d at 1097–98. *Id.* The court concluded that the "rule reflected by these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.*

With respect to the clearly established prong, the court recognized, "[t]o be sure, we have never before addressed the specific factual circumstances here, where a nurse is told that a patient is sweating, disoriented, and in need of a more thorough look but does nothing more than perform a quick 10-second blood test." *Id.* at 680. Nevertheless, "de Guzman is not entitled to qualified immunity simply because 'the very action in question has [not] previously been held unlawful." *Id.* (bracket in original), (quoting *Hope v. Pelzer*, 536 U.S. 635, 640 (1987)). Instead, state officials "'can still be on notice that their conduct violates established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Id.* (quoting *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020)). The court reasoned:

> If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, *Clement*, 298 F.3d at 905, or to fail to promptly set a fractured thumb, *Jett*, 439 F.3d at 1097–98—neither of which are potentially life-threatening conditions—the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated. Accordingly, every reasonable nurse in Nurse de Guzman's position would have understood that his treatment of Sandoval, or lack thereof, was constitutionally inadequate.

*Id.* at 680–81.

When compared to *Sandoval*, the facts alleged in the SAC present an even stronger case that Nurse Suaking violated Mr. Gil's constitutional right to adequate medical care.

15

The SAC's allegations clearly indicate Mr. Gil faced a substantial risk of harm. Like the decedent in *Sandoval*, the SAC alleges that during the intake and booking process, Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status, and confusion. (*SAC* ¶ 47.) At some point, Mr. Gil lost his balance and fell and was placed in a wheelchair so he would not fall again. (*Id.* ¶ 50.) Mr. Gil was also given a blood test, which unlike the decedent in *Sandoval*, resulted in a high blood-sugar reading, requiring 5 units of insulin. (*Id.* ¶ 48.) While under *Sandoval* these allegations alone are sufficient to support a finding that Mr. Gil faced a substantial risk of harm, the SAC includes additional allegations confirming Mr. Gil's condition was serious and he needed to be monitored. Specifically, the SAC alleges that Nurse Suaking was informed that Mr. Gil was unable to consent to medical treatment at PMCED, that the doctor stated, "additional tests should be performed" and the doctor instructed that Mr. Gil had to be returned to PMCED if he started experiencing chest pain or palpitations. (*Id.* ¶ 45.) The SAC further alleges Nurse Suaking did not communicate with Mr. Gill about his glucose level because he was unstable. (*Id.* ¶ 48.)

Given Mr. Gil's serious medical condition, the next issue is whether every reasonable nurse would understand, in light of established case law, that simply administering 5 units of insulin and then leaving Mr. Gil unattended for 14 hours violated his constitutional right to adequate medical care. The answer is clearly yes. Under *Sandoval*, any reasonable nurse or deputy aware of Mr. Gil's condition, including his high glucose level, would have understood that placing him in a cell, unmonitored for 14 hours put Mr. Gil in substantial risk of harm. This finding is made even more obvious by the SAC's allegation that the PMCED doctor's discharge note stated that Mr. Gil needed to be returned to the hospital if he began experiencing chest pain or palpitations. (*SAC* ¶ 45.) That instruction provided clear notice, not only to Nurse Suaking, but any of the Doe Defendants who were aware of it.

Defendants nevertheless argue the clearly-established prong is not met because Plaintiffs have not cited a case where the "individual to whom medical attention was

16

provided was misdiagnosed as being under the influence of methamphetamine." (*P&A* 11:17–21.) This argument appears to be based on Plaintiffs' allegation that Defendants incorrectly assumed Mr. Gil was "under the influence." (*See SAC* ¶ 50.) Apparently, Defendants believe that as long as they were wrong about the cause of Mr. Gil's serious medical condition, they could place him in a cell and ignore him for 14 hours. In this Court's opinion, this theory lacks any merit.

Regardless of the cause of Mr. Gil's serious medical condition, well settled Ninth Circuit law clearly obligated Defendants, at the very least, to continue monitoring Mr. Gil for chest pains and heart palpitations, as well as his blood glucose levels. As stated in *Sandoval*, "[i]f it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray . . . or to fail to promptly set a fractured thumb . . . neither of which are potentially life-threatening conditions—the same must be true for failing to provide any meaningful treatment to an inmate" who displayed thought disorganization, nonsensical communication, altered mental status, and confusion; at some point, lost his balance and fell and was placed in a wheelchair; had an elevated blood sugar reading of 253; and who a doctor stated needed to be monitored for chest pains and palpitations. *Id.*, 985 F.3d at 680–81 (citations omitted).[1]

Finally, Defendants argue the SAC fails to allege that "Nurse Suaking made any decision as to the conditions under which Decedent was confined . . . ." (*P&A* 15:6–8.) As *Sandoval* establishes, under the circumstances alleged in the SAC, the failure to act— i.e., to provide any meaningful treatment—constitutes a decision regarding the conditions

---

[1] Defendants alternatively argue that the Court should consider the Medical Examiner's Report (attached as Ex. A to the Dumitrescu Decl. [Doc. 18-2]), which Defendants' contend "establishes that Decedent was not misdiagnosed by staff, but was in fact under the influence of methamphetamine." (*P&A* 1:28— 2:2.) But nothing in the report contradicts the SAC's allegations regarding Mr. Gil's medical condition at intake or that the PMCED doctor instructed that Mr. Gil be returned if he had chest pains or palpitations. In fact, the report confirms Mr. Gil's elevated blood sugar, which the SAC alleges required that Mr. Gil's glucose be monitored. Accordingly, as explained above, regardless of the cause of Mr. Gil's condition, established law obligated Defendants to do more than ignore Mr. Gil for 14 hours.

1  under which Mr. Gil was confined. For these reasons, under well-established Ninth
2  Circuit law, Nurse Suaking is not entitled to qualified immunity.

3

4  **C.  "DOE" Defendants**

5      Defendants argue that all claims against "DOES 1-10" should be dismissed
6  because the SAC "only vaguely refers to the Doe defendants through improper group
7  pleading" and "fail[s] to satisfy the pleading requirements." (*P&A* 12:5–11.)  Plaintiffs
8  argue the SAC satisfies the pleading requirements and request an opportunity to conduct
9  discovery to identify each Doe Defendant. (*See Opp'n* 16:6–18:18.)
10      While the Federal Rules of Civil Procedure do not explicitly allow the naming of
11  fictitious or anonymous parties, "where the identity of the alleged defendant is not known
12  prior to the filing of a complaint, the plaintiff should be given an opportunity through
13  discovery to identify the unknown defendants, unless it is clear that discovery would not
14  uncover the identities, or that the complaint would be dismissed on other grounds."
15  *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023)
16  (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999)). Still, a "Section
17  1983 action must allege how each individual defendant directly participated in the
18  violation of the plaintiff's rights." *Id.* Thus, while a plaintiff "may refer to unknown
19  defendants as Defendant John Doe 1, John Doe 2, John Doe 3 and so on . . . he must
20  allege specific facts showing how each particular doe defendant violated his rights."
21  *Keavney v. Cnty. of San Diego*, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020). The
22  reason behind these requirements is to give named defendants like the County "crucial
23  notice of the nature of the claims" at issue. *Mendoza v. Cnty. of San Bernardino*, 2020
24  WL 2066142, at *4 (C.D. Cal. Feb. 21, 2020) (holding that the pleadings must be
25  "sufficient to describe the involvement" of doe defendants and to put "the County on
26  notice of the nature of the claim against it.").
27      Here, the SAC asserts claims against Doe Defendants 1-10. These defendants
28  consist of "'DOE Deputies,' 'DOE Nurses' and 'DOE Supervisors'" who work for San

18

Diego County.  (*SAC* ¶¶ 34, 36.) For the reasons discussed below, the Court finds the SAC pleads sufficient facts regarding the Doe Defendants' involvement to put the County on notice about the nature of the claims.

### 1.   <u>Doe Nurses and Doe Deputies.</u>

The Doe Deputies and Doe Nurses were all involved in processing Mr. Gil and conducting his medical screening exam. (*SAC* ¶ 46.) As discussed above, while being processed, Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status and confusion, had an elevated blood sugar level, and fell and needed to be placed in a wheelchair. (*SAC* ¶¶ 7, 45–47, 50, 74.) Additionally, the PMCED doctor's discharge instructions stated that "additional tests should be performed," and Mr. Gil needed to be brought back to PMCED if he started experiencing "chest pains or palpitations." (*Id.* ¶ 45.) Based on these facts, it is reasonable to infer that the Doe Deputies and Doe Nurses involved in Mr. Gil's intake process knew his medical condition was serious and he needed to be monitored.

Despite Mr. Gil's obvious and serious medical condition, the SAC also alleges:

> Defendants Suaking, DOE nurses, and DOE Deputies made the decision to place Mr. Gil in a holding cell to 'sober up' without conducting further medical assessments and without ensuring Mr. Gil would be monitored for chest pains, palpitations, and high glucose levels. Defendants Suaking, DOE nurses, and DOE Deputies intentionally failed to place Mr. Gil in a medical holding cell to ensure constant monitoring, and instead placed him in a normal holding cell knowing that he would not be medically monitored.

(*Id.* ¶ 50.) As explained above, these allegations are sufficient to state a section 1983 claim for violation of Mr. Gil's constitutional right to adequate medical care. Nevertheless, the SAC includes additional allegations regarding the Doe Defendants.

According to the SAC, the Doe Deputies also "performed hourly 11-53 checks" during "the 9 and ½ hours Mr. Gil was in the cell, with fecal matter all over himself," yet "failed to intervene and failed to summon medical care despite Mr. Gil's obvious need

19

for immediate medical care." (*SAC* at ¶ 55.) "An hour before he was discovered, at 5:21 p.m., Mr. Gil stopped moving and was unresponsive, lying on the floor of the cell. Two minutes later, a DOE deputy 'looks into the cell and leaves.'" (*Id.* ¶ 53.) At 6:03 p.m., "Mr. Gil was discovered dead and cold to the touch." (*Id.* ¶ 54.)

As to the nurses, the SAC also alleges they "were required to review the discharge instructions and input them in the electronic system" and "were also required to implement the directives set forth in the discharge instructions." (*SAC* ¶ 71.) According to the SAC, "[i]f that had happened, Mr. Gil would have been routinely monitored for chest pain and palpitations" and "his worsening symptoms would have been detected and treated promptly." (*Id.*) Instead, "DOE NURSES 6-10 were grossly indifferent to Mr. Gil's serious medical needs because Defendants were aware of Mr. Gil's medical distress but intentionally failed to adequately screen, assess, or follow-up with Mr. Gil despite several policy directives requiring otherwise." (*Id.* ¶ 73.)

Based on these allegations, the Court finds the SAC sufficiently states section 1983 claims against the Doe Deputies and Nurses.

### 2.   Doe Supervisors

Supervisors can be held liable in their individual capacity if (1) he or she personally participated in the constitutional violation, or (2) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). However, supervisors must have actual supervisory authority over the government actor who committed the alleged violations. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018).

In the *Estate of Silva v. City of San Diego*, 2020 WL 6946011 (S.D. Cal. Nov. 25, 2020), plaintiffs filed section 1983 claims against the Medical Administrator and Medical Director responsible for supervising the policies, practices, and operations for the San Diego County Sheriff's Department. *Id.* at *9. The FAC alleged the supervisors were aware "it was common for jail staff to ignore patients' medical charts or disregard the

20

information contained in their medical records" and that the Citizens' Law Enforcement Review Board and Disability Rights of California's report identified "deficiencies in the coordination of care and communication of medical conditions, including detainee's decompensating." *Id.* The FAC further alleged that the supervisors knew their prior failure to implement proper policies led to a substantial number of deaths, and their failure to implement new policies resulted in the defendant nurses' and deputies' failure to communicate critical medical information to corrections staff. *Id.* Based on these allegations, the district court found the FAC sufficiently alleged that the supervisors

> (1) … deliberately continued to implement policies they knew to be inadequate with respect to detainee medical care; (2) the implementation of these policies put Decedent at substantial risk of harm because they did not require proper communication of medical information or coordination of treatment; (3) [the supervisors] were aware of the deficiencies of their policies but did not change them to mitigate risk of detainee harm; and (4) by failing to implement proper policies, they caused Decedent's medical needs to be ignored by County medical staff, leading to his forceful extraction, and ultimately resulting in his death.

*Id.* (citing *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446–47 (9th Cir. 1991) (en banc) (concluding that knowledge of a policy and practice of overcrowding that allegedly resulted in inmate's rape could be sufficient to establish liability)). Accordingly, the court denied the motion to dismiss the claims against the supervisors.

The only difference between the allegations in *Estate of Silva* and this case is that Plaintiffs do not yet know the identities of the Doe Supervisors. The SAC, however, contains allegations that, if true, demonstrate the supervisors deliberately continued to implement policies they knew were inadequate with respect to detainee medical care, and which led to Mr. Gil's death.

The SAC includes allegations from which it is reasonable to infer the Doe Supervisors (1) were aware of deficient policies regarding detainee medical care and monitoring detainees in serious risk of harm and (2) failed to take any action. The SAC outlines eight incidents of in-custody deaths from 2008 through 2016 that allegedly

resulted from "subordinates' failure to coordinate and share critical information among personnel and failures to render emergent medical care to seriously ill inmates, causing inmates to die or suffer serious injuries." (*SAC* ¶ 95.) Seven of the incidents also involved "subordinates . . . failing to conduct proper cell checks or failing to follow jail policies regarding care and monitoring of seriously ill inmates . . . ." (*Id.* ¶ 96.) The SAC further alleges that after these incidents, the Sheriff's Department contracted with the National Commission on Correctional Heath Care (NCCHC) for assistance regarding compliance with its Standards for Health Services in Jail. (*Id.* ¶ 86.) In January 2017, the NCCHC provided a report that found VDF failed to meet 26 of 39 essential standards required for accreditation. (*Id.*) Four of the "key policy deficiencies" involved VDF's failures to: (1) properly identify incarcerated individuals' medical and mental health needs at intake, leading to some individuals not receiving proper care; (2) follow up after individuals received or requested medical or mental health services; (3) provide continuity of care; and (4) perform adequate safety checks to ensure the well-being of individuals. (*Id.* ¶¶ 88, 90, 91, 92.) With respect to the last deficiency, the SAC also alleges the report found that in 30-in custody deaths,

> we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy.

(*Id.* ¶ 92.) Finally, the SAC also alleges that the report found the "county was on notice of many of the identified policy deficiencies based on previous recommendations from other external oversight entities, including the San Diego Grand Juries and Disability

rights California" yet failed to take action to improve "the safety of individuals in its custody." (*Id.* ¶ 93.)

Despite the deficiencies outlined in the report, the SAC alleges that in 2022, nineteen inmates—including Mr. Gil—died in San Diego County jails, leading to another report by the California State Auditor. (*SAC* ¶ 83.) According to the SAC, the report found that San Diego County jails had the most in-custody deaths than any other county in California and that the County "failed to adequately prevent and respond to the problem…." (*Id.*) The report also allegedly stated the "high rate of death in San Diego County jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department policies and practices undermined it ability to ensure the health and safety of the individuals in its custody." (*Id.* ¶ 84.)

At this stage in the litigation, the Court must assume the above allegations are true. Based on those allegations, the Court finds the SAC adequately alleges the Doe Supervisors in charge of the Doe Deputies and Doe Nurses were aware of serious deficiencies in diagnosing inmates medical needs, providing follow up care, ensuring continuity of care and monitoring inmates. Because the SAC alleges these deficiencies caused Mr. Gil's death, the SAC sufficiently alleges liability against the Doe Supervisors.

### D. **Failure to Plead Objective Indifference**

Defendants argue the SAC fails to plead objective indifference.  For the reasons stated under the qualified immunity analysis, the Court finds the SAC sufficiently alleges objective indifference against Nurse Suaking.

### E. **Failure to Identify an Official, Formal Policy**

Defendants move to dismiss the second claim for relief for *Monell* liability against the County. (*P&A* 17:12–19:18.) Defendants contend Plaintiffs failed to identify an "adopted official policy." (*Id.*)

1     Under *Monell v. Dep't of Soc. Servs. of City of New York*, municipalities such as

2  the County cannot be held vicariously liable under section 1983 for the actions of their

3  employees.  436 U.S. at 692.  Instead, "a municipality can be found liable under § 1983

4  only where the municipality itself causes the constitutional violation at issue."  *City of*

5  *Canton, Ohio v. Harris*, 489 U.S. 378, 38 (1989) (emphasis in original). Thus, to be liable

6  under Section 1983 for a *Monell* claim, Plaintiffs must show either: (1) "a [municipal]

7  employee committed the alleged constitutional violation pursuant to a formal

8  governmental policy or a longstanding practice or custom which constitutes the standard

9  operating procedure of the local governmental entity";  (2) "the individual who

10 committed the constitutional tort was an official with final policy-making authority and

11 that the challenged action itself thus constated an act of official governmental policy"; or

12 (3) "an official with final policy-making authority ratified a subordinate's

13 unconstitutional decision or action and the basis for it." *Mendoza*, 2020 WL 2066142, at

14 *6 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).

15    To state a claim for *Monell* liability based on an unconstitutional pattern and

16 practice, plaintiff must allege facts showing the defendants acted pursuant to a custom

17 that is so "persistent and widespread" that it establishes a "permanent and well settled

18 city policy." *Monell*, 436 U.S. at 690–91.  A municipal policy exists when "a deliberate

19 choice to follow a course of action is made from among various alternatives by the

20 official or officials responsible for establishing final policy with respect to the subject

21 matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  In the

22 absence of an express policy, an unconstitutional pattern or practice may be inferred from

23 pervasive evidence of "repeated constitutional violations" that are closely related to the

24 alleged unconstitutional pattern and practice. *Gillette*, 979 F.2d at 1349; *Oviatt v.*

25 *Pearce*, 954 F.2d 1470, 1481 (9th Cir. 1992).

26    As discussed above regarding the Doe Supervisors, the SAC alleges repeated

27 constitutional violations of inmates' rights to adequate medical care. Based on these

28

allegations, the Court finds the SAC sufficiently alleges a *Monell* claim against the County based on an unconstitutional pattern or practice.

### F.   Negligence Cause of Action

Defendants argue Plaintiffs cannot pursue their negligence claim against the County because "a public entity is not liable for an alleged tort unless entity liability for the particular type of tort is imposed by statute" and Plaintiffs fail to identify a statutory or constitutional basis. (*P&A* 19:21–23, 20:8–9.)  Plaintiffs respond by pointing out that the negligence claim specifically alleges liability under California Government Code §§ 815.2, 815.6 and 845.6. (*Opp'n* 24:26–27.) Defendants' reply does not address Plaintiffs' contention, presumably abandoning the argument. (*See Reply*.)

Regardless, section 815.2 "generally provides that a public entity is liable for injury caused by the tortious acts or omissions of its . . . employees to the same extent that the public entity would be subject to such liability if it were a private person." *Pallamary v. Elite Show Services, Inc.*, 2018 WL 3064933, *11 (S.D.Cal. June 19, 2018). Because Plaintiffs' negligence cause of action is based on section 815.2, the Court finds the claim is adequately alleged against the County.

### G.   Bane Act Cause of Action

Defendants argue the Bane Act cause of action must be dismissed. They first contend a Bane Act claim cannot be maintained directly against the County because it is immune under California Government Code § 844.6. (*P&A* 21:1–6.) Defendants next argue the claim cannot be maintained against Nurse Suaking or the Doe Defendants because there is no indication they acted with a specific intent. (*Id.* 21:7–15.) Plaintiffs respond that the SAC, in essence, adequately alleges the claim against the Nurse Suaking and the Doe Defendants. (*Opp'n* 24:4–16.)

As an initial matter, because Plaintiffs do not dispute Defendants' contention that the County is not directly liable under the Bane Act, the Court will grant the County's

25

motion to dismiss the claim. With regard to Nurse Suaking and the Doe Defendants, numerous cases have applied the Bane Act to claims involving deliberate indifference, reasoning that since "deliberate indifference is closer to intentional conduct [than unintentional conduct]," liability exists where the government official "knows of and disregards a substantial risk to inmate health or safety."  *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act [under the Bane Act] that rises above mere negligence . . . ."); *Cravotta v. Cnty. of Sacramento*, 2024 WL 645705, at *13 (E.D. Cal. Feb. 15, 2024) ("[A] Bane Act claim may be based on deliberate indifference to serious medical needs."); *Est. of Neil v. Cnty. of Colusa*, 2022 WL 4291745, at *9 (E.D. Cal. Sept. 16, 2022) ("Courts have also found that prisoners who sufficiently allege [that] officials acted with deliberate indifference to their medical needs in violation of their constitutional rights also adequately allege a Bane Act violation.").

In the context of deliberate indifference to the medical needs of prisoners, courts have held that a prisoner's Bane Act claim need simply allege "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *M.H.*, 90 F. Supp. 3d at 896 (quoting *Jett*, 439 F.3d at 1096); *see Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (emphasis added) ("Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials 'knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening,' such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations."); *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 802 n.31, as modified (Nov. 17, 2017) (citing with approval *M.H. v. County of Alameda*'s holding that a Bane Act claim can stated based on allegations of "deliberate indifference

to prisoner's medical needs."). While "mere negligence in diagnosing or treating a medical condition" does not give rise to a Bane Act claim, "prison officials or practitioners 'deny[ing], delay[ing], or intentionally interfere[ing] with medical treatment" does. *M.H.*, 90 F. Supp. 3d at 896 (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988)).

As discussed above, the SAC sufficiently alleges objective deliberate indifference against Nurse Suaking and the Doe Defendants. Accordingly, the SAC sufficiently alleges a Bane Act claim against these defendants.

### H.    Punitive Damages

Defendants argue Plaintiffs cannot seek punitive damages against the County. (*P&A* 22:11–19.) Plaintiffs do not respond to this argument.

A municipality cannot be held liable for punitive damages. Cal. Gov't Code § 818; *Pearl v. City of L.A.*, 36 Cal.App.5th 475, 486 (2019). Accordingly, the Court will dismiss the punitive damage claim as to the County.

## IV.    CONCLUSION & ORDER

For the above reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss [Doc. 18] as follows: the Bane Act cause of action and punitive damage claim are dismissed without leave to amend as to the County. The motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated:  September 26, 2024

Hon. Thomas J. Whelan
United States District Judge

27

23-cv-0899-W-DDL