# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

JENNIFER SCHMIDT, et al.,

                                    Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

                                    Defendants.

Case No.:  23-cv-0899-W-DDL

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT WITH LEAVE TO AMEND [DOC. 81]**

   Pending before the Court is a motion to dismiss the Fourth Amended Complaint ("4AC" [Doc. 16]) under Federal Rule of Civil Procedure 12(b)(6). The motion was filed by individual deputies and nurses of Defendant County of San Diego who were first added to the 4AC. Plaintiffs Jennifer Schmidt and Lyndzy Biondo oppose.

   The Court decides the matter on the papers submitted and without oral argument. *See* Civ.L.R. 7.1(d)(1).  For the following reasons, the Court **GRANTS** the motion [Doc. 81] **WITH LEAVE TO AMEND**.

1

1    **I.    FACTUAL BACKGROUND**

2        In evaluating the motion to dismiss, the Court must assume the truth of the

3    following well-pled allegations, as well as any reasonable inferences arising therefrom.

4

5        **A.    Mr. Gil's arrest.**

6        On February 12, 2022, Gilbert Gonzalo Gil, crashed his truck in a ditch in

7    Escondido, California. (*4AC* ¶ 73.) Mr. Gil was 67 and suffering from confusion

8    associated with early on-set dementia. (*Id.*) The California Highway Patrol ("CHP")

9    found Mr. Gil inside the truck. (*Id.* ¶ 74.) The 4AC alleges that it is unknown at this time

10   if Mr. Gil was under the influence based on alleged statements he made; however, CHP

11   arrested him for being under the influence. (*Id.*)

12       At approximately the same time, Mr. Gil's daughter, Plaintiff Jennifer Schmidt,

13   noticed that her father had not come over as he did every night. (*4AC* ¶ 75.)  Jennifer

14   checked an app on her phone and discovered her father had been in a car accident. (*Id.*)

15   She drove to the scene and found Mr. Gil being placed in the back of a patrol car. (*Id.*)

16   Jennifer asked officers what was happening and was told Mr. Gil was being arrested for

17   being under the influence. (*Id.*)

18       Jennifer noticed her father was showing signs of thought disorganization,

19   nonsensical communication, altered mental status, and confusion and she told the CHP

20   officers that these symptoms were associated with early on-set dementia and uncontrolled

21   diabetes. (*4AC* ¶ 76.) The officers arrested Mr. Gil and transported him to the Vista

22   Detention Facility ("VDF"), where he was detained under a "book and release" status and

23   placed in a holding cell to "sober up." (*Id.* ¶¶ 77, 90.) It is unknown whether the officers

24   informed VDF intake staff that Mr. Gil was suffering from early on-set dementia and

25   diabetes. (*Id.*) Mr. Gil was placed in a holding cell that night. (*Id.*)

26       Early the next morning, Jennifer contacted the CHP. (*4AC* ¶ 78.) She was informed

27   that Mr. Gil had been booked into VDF as a book and release. (*Id.*) Jennifer checked the

28   Sheriff's website and noticed that he was on the release cue. (*Id.*) Inmates on the release

que are usually released between 7:00 a.m. and 9:00 a.m. (*Id.*) Because Mr. Gil was not released by 9:00 a.m., Jennifer called the jail to ask about her father. (*Id.*) An unknown medical nurse stated that Mr. Gil was in a book and release cell but was not "sobering up" so she was not sure when he would be released. (*Id.* ¶ 79.) In response, Jennifer said that Mr. Gil was suffering from symptoms of early on-set dementia and uncontrolled diabetes and, therefore, "He's not going to sober up, he's sick. This is not a drug issue." (*Id.*) The nurse told Jennifer she would call her back after speaking to a supervisor. (*Id.*) A minute later, the nurse called Jennifer and told her to meet in the lobby and they would release Mr. Gil into her custody. (*Id.*)

Jennifer picked up Mr. Gil and signed for his property because he was physically incapable. (*4AC* ¶ 80.) Jennifer then took Mr. Gil to his home to eat and sleep, hoping that would help calm him. (*Id.*) However, later that night, Mr. Gil again exhibited bizarre behavior. (*Id.*) A family member called 911 and Escondido Police were dispatched to the home. (*Id.*) Mr. Gil was arrested for being under the influence. (*Id.*)

Before transporting Mr. Gil to VDF, at 11:30 p.m., Mr. Gil was taken to Palomar Medical Center Emergency Department ("PMCED") to determine if he was medically cleared to be detained. (*4AC* ¶ 81.) Due to Mr. Gil's condition, he could not consent to medical treatment. (*Id.*) The PMCED doctor informed Escondido Officer Donaghy that "based on a *visual* examination, Mr. Gil *appears* medically safe to detain … however, additional tests should be performed." (*Id.*, emphasis in original.) The doctor also stated Mr. Gil needed to be brought back to PMCED if he started experiencing "chest pain or palpitations." (*Id.*) The doctor filled out a discharge form to that effect, which Officer Donaghy provided to Defendant Silva Suaking, the medical intake nurse at VDF. (*Id.*)

## B.    Mr. Gil's Intake Medical Screen at VDF.

During the intake process at VDF, "surveillance footage confirmed Mr. Gil displayed thought disorganization, nonsensical communication, altered mental status, confusion, uncontrollable shaking/tremors, and an extremely unstable gait." (*4AC* ¶ 83.)

The 4AC alleges these are signs and symptoms associated with early on-set dementia and uncontrolled diabetes. (*Id.*) Because of his condition, Nurse Suaking evaluated Mr. Gil as he sat on a bench, slumped over and shaking uncontrollably, rather than at her desk, where evaluations are generally conducted. (*Id.*) Despite his condition, Nurse Suaking indicated that he was "fit for booking" and continued the intake process. (*Id.* ¶ 84.) Mr. Gil's vitals revealed his pulse was 111, respirations 20 and glucose 253. (*Id.* ¶ 85.) As a result of his glucose test, Nurse Suaking administered 5 units of insulin per the Standard Nursing Procedure ("SNP"). (*Id.*) She also noted he suffered from hypertension and diabetes but failed to implement a medical treatment plan for his hypertension, and medical records indicate she did not order follow-up glucose monitoring three times per day as directed by the County's SNP. (*Id.*) She also did not assign Mr. Gil to a sober cell or a medical observation cell (in violation of county policies), which would have resulted in Mr. Gil being medically evaluated at least every four hours. (*Id.* ¶ 87.) And despite reading the PMCED discharge instructions, she did not "input the discharge medical instructions into the jail's electronic medical system" and did not "implement a directive to monitor Mr. Gil for chest pains and palpitations, as ordered by the PMCED doctor." (*Id.* ¶ 86.)

Less than an hour after Nurse Suaking's intake evaluation, Mr. Gil lost his balance and fell during the booking process. (*4AC* ¶ 89.) Defendant Deputies Cassidy and Baca placed Mr. Gil in a wheelchair to prevent him from falling again. (*Id.*) Surveillance footage confirms the Deputies observed Mr. Gil display severe thought disorganization, nonsensical communication, altered mental status, confusion, and an extremely unstable gait throughout their contact with Mr. Gil. (*Id.*) Because of his behavior, the deputies had a difficult time processing Mr. Gil. (*Id.*) The 4AC further alleges these deputies, as well as Defendants Lt. Kamoss and Sgt. Gomez, knew (1) about Mr. Gil's arrest the previous day by the CHP under the "book and release" status and (2) that Jennifer previously told "jail staff that Mr. Gil was not under the influence but suffering from untreated diabetes and early on-set dementia." (*Id.* ¶ 90.)

4

**C.**    **Mr. Gil is housed in a regular holding cell instead of a sober cell or medical monitoring cell.**

According to the 4AC, because Defendants "intentionally made a wrong and unreasonable assumption that Mr. Gil was 'heavily' under influence," they decided to place Mr. Gil in a cell to sober up. (*4AC* ¶¶ 92, 93.) But because the sober cell was occupied, Deputies Cassidy and Baca placed Mr. Gil in a regular holding cell and did not monitor him, nor did they communicate to medical staff that he "needed sober cell monitoring and evaluation. . . ." (*Id.* ¶ 93.)

After being placed in the holding cell, Deputies Cassidy, Baca, and Lt. Kamoss performed safety checks at 4:09 a.m., 5:05 a.m., and 5:10 a.m. (*4AC* ¶ 94.) "During each safety check, Mr. Gil continued to show signs of medical distress," which the 4AC describes as "thought disorganization, nonsensical communication, altered mental status, confusion, and an extremely unstable gait." (*Id.*) Nevertheless, the deputies did not attempt to intervene, nor did they summon medical care. (*Id.*)

At 5:32 a.m. and 6:00 a.m., Sgt. Gomez and Deputies Aberle and Cassidy performed safety checks. (*4AC* ¶ 95.) "Again, during each safety check, Mr. Gil continued to show signs of medical distress, which is confirmed by surveillance footage." (*Id.*) Despite signs of medical distress, "Sergeant Gomez and Defendant Deputies Aberle and Cassidy failed to intervene and failed to summon medical care." (*Id.*)

At 6:30 a.m., there was a shift change. (*4AC* ¶ 96.) Surveillance footage confirms Deputies Baca and Aberle debriefed the on-coming Defendant Deputies Madrigal and Maldonado regarding Mr. Gil's condition. (*Id.*) Over the next two hours, Deputies Madrigal, Maldonado and Defendant Deputy Angulo "conducted hourly checks and observed Mr. Gil's continued signs" of medical distress. (*Id.* ¶ 97.) Despite observing Mr. Gil's medical condition, none of the deputies intervened or summoned medical care or advised medical staff of Mr. Gil's condition. (*Id.*)

At 8:34 a.m., five hours after being placed in the holding cell, "surveillance footage confirms Mr. Gil, in a confused state, removed his pants and defecated all over

himself, the cell floor, and the sink." (*4AC* ¶ 98.) He then "fell over in front of the cell
door." (*Id.*) "At that exact time, surveillance footage confirms Defendant [Deputy]
Talamantez was in the adjacent holding cell and observed Mr. Gil fall." (*Id.*) He also
"observed the fecal matter on Mr. Gil and in the cell" but "did not intervene and did not
summon medical care." (*Id.*)

At 9:28 a.m., Defendant Nurse Calderon conducted a "welfare check." (*4AC* ¶ 99.)
Nurse Calderon "did not enter the cell or attempt to communicate with Mr. Gil" and
observed that he was "unresponsive, confused, shaking, unstable, and covered in feces."
(*Id.*) Nurse Calderon did not intervene and did not summon medical care. (*Id.*)

At 11:51 a.m., Deputy Madrigal approached Mr. Gil's holding cell intending to
move him to a sober cell. (*4AC* ¶ 100.) When Mr. Gil failed to respond, Deputy Madrigal
left Mr. Gil in the holding cell and "did not intervene or summon medical care." (*Id.*)

According to the 4AC,

> 101.   Over the next nine hours, several inmates housed nearby stated Mr.
> Gil was banging on the cell door and windows asking for help. Fecal matter
> was visibly on the cell window. Inmates stated Mr. Gil looked sick and was
> continually shaking and throwing up. Another inmate stated Mr. Gil was
> experiencing seizures inside Holding Cell #3. At one point, another inmate
> gained the attention of an unknown Defendant Deputy alerting the Deputy
> that Mr. Gil was sick and in need of medical attention. The Deputy ignored
> the inmate and continued walking without intervening or summoning
> medical attention.
>
> 102.   Despite these obvious and clear indications of medical distress, not
> one Defendant Deputy or Defendant Nurse checked on Mr. Gil or provided
> him with medical treatment (or summoned medical care) for the next nine
> hours he was in the holding cell.
>
> 103.   In fact, over those nine hours Defendants Madrigal, Maldonado,
> Nuqui, Angulo, Kamoss, Gomez, Quinones, Pozun, Cascioppo all performed
> hourly safety checks and directly observed Mr. Gil in obvious medical
> distress as indicated by inmates housed near Holding Cell #3. Yet, each
> Defendant failed to enter the cell, ask Mr. Gil if he needed medical attention,
> or summon medical care.

23-cv-0899-W-DDL

104.   Surveillance footage confirmed Mr. Gil's last movement occurred at 5:21 p.m.

(*4AC ¶¶ 101–104.*) At 5:23 p.m., Defendant Mental Health Liaison Deputy Garcia conducted his first welfare check on Mr. Gil. (*4AC ¶ 105.*) However, before conducting the welfare check, Deputy Garcia

"walked through the intake area several times" throughout the day and observed Mr. Gil in Holding Cell #3 "with his pants down, making animal noises such as chirping," and observed feces on the ground and on his person. Mr. Gil was also shaking and visibly disoriented. However, Deputy Garcia did not conduct a welfare check until 5:23 p.m.

(*Id.*) At that time, Deputy Garcia "observed Mr. Gil slumped over the sink, unresponsive, and gasping for air, indicating early cardiac arrest and respiratory distress." (*Id.*) Instead of intervening, or opening the cell door to check on Mr. Gil, or summoning medical care, the Deputy "'elected to let [Mr. Gil] sleep'" and walked away. (*Id.*)

At 6:02 p.m., Mr. Gil was found dead in his cell. (*4AC ¶ 106.*)

### D.   **Plaintiffs' lawsuit.**

On May 16, 2023, Plaintiffs Jennifer Schmidt and Lyndzy Biondo filed this lawsuit against the County of San Diego and various named and Doe employees. On August 28, 2023, Plaintiffs filed the First Amended Complaint, which Defendants moved to dismiss arguing, among other things, that Plaintiffs lacked standing. This Court granted the motion to dismiss with leave to amend.

On January 10, 2024, Plaintiffs filed the Second Amended Complaint, and Defendants again challenged Plaintiffs' standing and argued the causes of action should be dismissed for a variety of other reasons. On September 26, 2024, this Court granted in part the motion by dismissing the Bane Act cause of action and punitive damage claim against the County without leave to amend. The motion was denied in all other respects.

On September 2, 2025, Plaintiffs filed the 4AC. On September 16, 2025, Deputies Aberle, Angulo, Baca, Cascioppo, Cassidy, Garcia, Madrigal, Maldonado, Nuqui, Pozun,

Quinones, Talamantez, Sgt. Gomez, Lt. Kamoss, and Nurses Calderon, Munoz and Rada (collectively, the "Individual Defendants"), moved to dismiss on the following grounds: the 4AC fails to allege a claim for deliberate indifference; they are entitled to immunity under California Civil Code § 845.6; the 4AC fails to state a Bane Act violation; and the claims are time barred. On October 20, 2025, Plaintiffs filed their opposition and on October 27, 2025 Defendants filed their reply.

## II.    LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although well-pled allegations are assumed true, a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

23-cv-0899-W-DDL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.    DISCUSSION

### A.    Deliberate indifference under the Fourteenth Amendment

The Individual Defendants first argue the 4AC fails to allege facts supporting a claim for deliberate indifference. (*P&A* [Doc. 81-1] 4:2–14:11.) Because Mr. Gil was a pretrial detainee, the claim for deliberate indifference is evaluated under the Fourteenth Amendment, which requires the 4AC to allege facts demonstrating the following:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). With respect to the third element, "the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

In *Sandoval*, 985 F.3d 657, a pretrial detainee, Ronnie Sandoval, died from a methamphetamine overdose while in a San Diego County jail. Unbeknownst to the deputies, Sandoval swallowed methamphetamines before he was arrested. At the jail, deputies noticed Sandoval was sweating, disoriented and lethargic so took him to a medical station for evaluation. A deputy informed defendant Nurse de Guzman about his observations and stated that Sandoval needed to be "thoroughly" looked at. *Id.* at 662.

9

1    Shortly after being placed in a medical observation cell, Nurse de Guzman and

2    another deputy entered the cell and noticed Sandoval "shaking mildly" and appearing to

3    be having withdrawals. *Id.* at 662. The nurse gave Sandoval a blood sugar test, which

4    came back normal and then left him alone and unmonitored. *Id.* at 663. Approximately 8

5    hours later, as a deputy walked by Sandoval's cell, the deputy noticed Sandoval's eyes

6    "'weren't tracking' and that his skin tone 'wasn't fleshy color.'" *Id.* Sandoval's eyes then

7    rolled back in his head and, as the deputy turned to call for help, Sandoval's head hit the

8    wall and he slid to the floor. *Id.* The deputy and others entered Sandoval's cell and

9    observed "seizure-like activity." *Id.* Paramedics arrived, but Sandoval died. *Id.* at 664.

10    In the section 1983 lawsuit that followed, the district court concluded Nurse de

11    Guzman (and others) were entitled to qualified immunity and granted summary

12    judgment. Plaintiff appealed. The Ninth Circuit first evaluated whether Nurse de Guzman

13    was deliberately indifferent to Sandoval's medical needs. This issued turned on whether a

14    reasonable nurse, knowing what de Guzman knew, would have understood that "failing

15    to check on Sandoval for hours and failing to pass on information about his condition . . .

16    , 'presented a substantial risk of harm'" to Sandoval. *Id.* at 678 (bracket in original) (citing

17    *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019)). Because a

18    reasonable nurse that "was told that Sandoval was sweating, tired and disoriented, and

19    that 'there was still something going on' that needed to be 'look[ed] at . . . more

20    thoroughly'—would understand that Sandoval faced a substantial risk of harm," the court

21    concluded Nurse de Guzman was deliberately indifferent to Sandoval's serious medical

22    need. *Id.* at 679. Accordingly, the next issue was:

> . . . whether every reasonable nurse would understand, in light of established
> case law, that de Guzman violated Sandoval's constitutional right to
> adequate medical care when he responded by merely performing a 10-
> second blood sugar test—a test performed earlier to no avail— and then
> walking away, leaving Sandoval unattended for six hours despite the fact
> that he was only 20 feet from de Guzman's nursing station.

*Id.*

The court explained that "[o]ur cases make clear that prison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment" or when "prison officials choose a course of treatment that is 'medically unacceptable under the circumstances.'" *Id.* (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) and *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)). Under this standard, the Ninth Circuit previously held "correctional officers could be liable for failing to provide constitutionally adequate medical care when they knew that inmates had been exposed to pepper spray but wait[ed] four hours before allowing them to leave their cells to shower," *Clement v. Gomez*, 298 F.3d 898, 902, 904–05 (9th Cir. 2002), and that a "doctor could be held liable for a constitutional violation when he knew that an inmate's thumb was fractured but failed to ensure that the fracture was set and cast," *Jett*, 439 F.3d at 1097–98. *Id.* The "rule reflected by these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.* Under this precedent, the court found "all reasonable nurses would understand that de Guzman's minimal—almost nonexistent—course of treatment violated the Constitution." *Id.* at 679.

*Sandoval* is helpful because the Plaintiffs' theory is that the Individual Defendants were aware of Mr. Gil's serious medical condition yet stood idly by and did nothing to assist him. Defendants, on the other hand, argue Plaintiffs fail to allege deliberate indifference because, in essence, the 4AC's paragraphs that specifically refer to each Individual Defendant are either too vague or simply do not suggest Mr. Gil was suffering from a serious medical condition. For the reasons that follow, the Court finds that while the allegations are not sufficient to state a claim against Deputy Aberle, they suffice to state a claim against the remaining Individual Defendants.

//

//

23-cv-0899-W-DDL

1

### 1.    Nurses Rada and Munoz

Defendants argue the deliberate indifference claim against Nurses Rada and Munoz fails because the 4AC alleges they observed "Mr. Gil in severe and obvious medical distress' throughout [their] shift without specifying what [they] observed" and generally alludes to the nurses "hearing 'unusual noises' and Decedent 'asking for medical help' without further elaboration." (*P&A* 8:3–19.)  This argument lacks merit.

According to the 4AC, when Mr. Gil was placed in his cell at 4:09 a.m., he showed the following signs of medical distress: "thought disorganization, nonsensical communication, altered mental status, confusion and an extremely unstable gait." (*4AC* ¶ 94.) By 8:34 a.m., "surveillance footage confirms Mr. Gil, in a confused state, removed his pants and defecated all over himself, the cell floor, and the sink. (*Id.* ¶ 98.) At 9:28 a.m., Mr. Gil was "unresponsive, confused, shaking, unstable, and covered in feces." (*Id.* ¶ 99.) From 9:28 a.m. to 6:02 p.m., "inmates housed nearby stated Mr. Gil was banging on the cell door and windows asking for help." (*Id.* ¶ 101.) Inmates also stated "Mr. Gil looked sick and was continually shaking and throwing up" and that "Mr. Gil was experiencing seizures." (*Id.*) At some point Mr. Gil, while his pants were down, began "making animal noises such as chirping" and fecal matter was visible on his cell window. (*Id.* ¶¶ 101, 105) In addition to this description of Mr. Gil's medical distress, the 4AC alleges his cell was only 15 feet from where Nurses Rada and Munoz worked a 12-hour shift. (*4AC* ¶¶ 88, 89.) Given this proximity to Mr. Gil's cell and the allegation that other "inmates housed nearby" were able to hear him banging on his cell and asking for help, it is reasonable to infer that at some point during their 12-hour shift Nurses Rada and Munoz would have become aware of Mr. Gil's severe medical distress.

Under *Sandoval* and *Gordon*, these allegations state a claim for deliberate indifference. They plausibly allege that the nurses made an intentional decision not to provide assistance to Mr. Gil; that decision placed Mr. Gil at a substantial risk of harm; there were reasonable available measures to abate the risk (i.e, by providing assistance)

12

but the nurses did not take such measures; and the failure to provide Mr. Gil assistance led to his death.

### 2.     Nurse Calderon

Regarding Nurse Calderon, the 4AC alleges the nurse "conducted a 'welfare check'" of Mr. Gil at 9:28 a.m., but "did not enter the cell or attempt to communicate" with him. (*4AC* ¶ 99.) Approximately one hour before this welfare check, "surveillance footage confirms Mr. Gil, in a confused state, removed his pants and defecated all over himself, the cell floor, and the sink. Mr. Gil then fell over in front of the cell door." (*Id.* ¶ 98.) Consistent with this allegation, the 4AC alleges that when Nurse Calderon conducted the "welfare check" at 9:28 a.m., the nurse "observed Mr. Gil was unresponsive, confused, shaking, unstable, and covered in feces." (*Id.* ¶ 99.)

Despite the above allegations, Defendants assert (1) "it is unclear what observations Nurse Calderon made that should have led to additional medical care" and (2) it is unclear how Nurse Calderon's "particular action" caused Mr. Gil's injuries. (*Defs' P&A* 12:22–27.) In essence, Defendants appear to be contending that when a nurse observes an inmate "unresponsive, confused, shaking, unstable, and covered in feces" it is reasonable to do nothing, despite their.  The argument indicates a lack of understanding regarding Defendants' constitutional obligations toward detainees.

Under *Sandoval* and *Gordon* these allegations state a claim for deliberate indifference. They plausibly allege that Nurse Calderon made an intentional decision not to provide assistance to Mr. Gil; that decision placed Mr. Gil at a substantial risk of harm; there were reasonable available measures to abate the risk (i.e, by providing assistance) but Nurse Calderon did not take such measures; and the failure to provide Mr. Gil assistance led to his death.

//

//

### 3.    Deputy Aberle

The 4AC's theory against Deputy Aberle relies heavily on his alleged knowledge of Mr. Gil's condition on the day he was arrested by CHP for driving under the influence. According to the 4AC, when Mr. Gil was brought to VDF by the CHP, Deputy Aberle was one of four deputies that "had individual contact with Mr. Gil during the early morning hours on February 13, 2022. . . ." (*4AC* ¶ 90.) Although Mr. Gil was "placed in a holding cell to 'sober up[,]' . . . over the course of eight hours, Mr. Gil never 'sobered up.'" (*Id.*) The 4AC further alleges that Mr. Gil was released after "Jennifer advised jail staff that Mr. Gil was not under the influence but suffering from untreated diabetes and early on-set dementia," and that this "information was known to Defendants Baca, Aberle, Kamoss, and Gomez." (*Id.* ¶ 90.) Based on this information, the 4AC asserts that when Deputy Aberle had a "difficult time processing Mr. Gil due to his behavior" and "displaying the same exact symptoms from the day before," the deputy should have intervened or advised/summoned medical care. (*Id.* ¶ 91.)

Assuming for the sake of argument that the above allegations indicate that Deputy Aberle should have known Mr. Gil faced a substantial risk of harm, the allegations do not suggest Deputy Aberle made an intentional decision to not provide him medical attention. The 4AC's allegations suggest that after Deputy Aberle processed Mr. Gil, Deputies Baca and Cassidy made the decision to place Mr. Gil in a regular holding cell. (*4AC* ¶ 92.) Additionally, the 4AC alleges that Deputies Baca and Cassidy initially "intended to place Mr. Gil in a sober cell, but the sober cell was occupied" and the deputies "did not attempt to find another sober cell in the facility. . . ." (*Id.* ¶ 93.) The 4AC also alleges that if Mr. Gil was placed in a sober cell, he would have received closer medical monitoring., i.e., every 4 hours—but Deputies Baca and Cassidy changed their minds because the sober cells were full. (*Id.* ¶¶ 85, 87, 93.) These allegations do not support an inference that Deputy Aberle was involved in the decision to place Mr. Gil in a regular cell. Additionally, it is reasonable to infer from the allegations that after processing Mr. Gil, Deputy Aberle believed he was going to be placed in a sober cell that provided closer

monitoring. For this reason, the Court finds the 4AC fails to state a claim for deliberate indifference against Deputy Aberle.

### 4.    Deputies Baca and Cassidy

The most difficult analysis concerns the claims against Deputies Baca and Cassidy.

The 4AC alleges that Deputy Baca was one of the four deputies that was made aware that Mr. Gil was suffering from untreated diabetes and early onset dementia. (*4AC* ¶ 90.) After Mr. Gil fell during the booking process, Deputies Baca and Cassidy placed him in a wheelchair to prevent him from falling again. (*4AC* ¶ 89.) The 4AC also alleges that the deputies "observed Mr. Gil display thought disorganization, nonsensical communication, altered mental status [and] confusion" throughout their contact with him, including during safety checks of his holding cell at 4:09 a.m., 5:05 a.m. and 5:10 a.m. (*Id.* ¶¶ 89, 94.) Reading these allegations in favor of Plaintiffs, it is reasonable to infer Deputies Baca and Cassidy knew Mr. Gil had a serious medical need and thus faced a substantial risk of harm. *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) (explaining that a serious medical need includes the "presence of a medical condition that significantly affects an individual's daily activities" or the "existence of chronic and substantial pain.").

Further, the 4AC alleges the deputies intended to place Mr. Gil in a sober cell, which would have resulted in medical monitoring every 4 hours. (*4AC* ¶¶ 85, 87, 93.) This allegation suggests they were aware Mr. Gil had a serious medical need and that Mr. Gil's condition required monitoring. Yet, according to the 4AC, because the sober cell was occupied, the deputies placed him in a regular cell instead of transforming his holding cell "into a sober cell which is routinely done when the sober cells are occupied." (*Id.*) Additionally, "despite knowing Mr. Gil was in medical distress," the deputies allegedly failed to monitor him or "communicate to medical staff that Mr. Gil needed sober cell monitoring. . . ." (*Id.*)

Based on these facts, the 4AC satisfies the *Gordon* and *Sandoval* requirements for alleging a deliberate indifference claim against Deputies Baca and Cassidy. The deputies made an intentional decision to house Mr. Gil in a regular cell despite being aware that he was in severe medical distress; that decision placed Mr. Gil at a substantial risk of harm; there were reasonable available measures to abate the risk (i.e, monitoring Mr. Gil or communicating to medical staff that he "needed sober cell monitoring and evaluation" (*id.* ¶ 93)) and the failure to provide Mr. Gil assistance led to his death.

### 5. Deputies Talamantez, Madrigal, Maldonado, Garcia, Angulo, Nuqui, Quinones, Pozun, Cascioppo, Lt. Kamoss, and Sgt. Gomez

Regarding the remaining deputies, the 4AC's allegations demonstrate that after seeing Mr. Gil in severe medical distress, they made an intentional decision not to provide assistance to Mr. Gil; that decision placed Mr. Gil at a substantial risk of harm; there were reasonable available measures to abate the risk (i.e, by providing assistance) but the deputies did not take such measures; and the failure to provide assistance to Mr. Gil led to his death.

The 4AC alleges that Mr. Gil removed his pants and defecated all over himself and his cell at 8:34 a.m. (*4AC* ¶ 98.) When this occurred, Deputy "Talamantez was in the adjacent holding cell and observed Mr. Gil fall." (*Id.*) The 4AC further alleges that the deputy "observed the fecal matter on Mr. Gil and in the cell" but "did not intervene and did not summon medical care." (*Id.*) At this point, the 4AC alleges that Mr. Gil continued to display "signs of thought disorganization, nonsensical communication, altered mental status, confusion, and an extremely unstable gait." (*Id.* ¶ 97.) These allegations state a claim for deliberate indifference against Deputy Talamantez.

The 4AC alleges that at 11:51 a.m., Deputy Madrigal approached Mr. Gil's holding cell intending to move him to a sober cell. (*4AC* ¶ 100.) Again, by this time, Mr. Gil "removed his pants and defecated all over himself, the cell floor, and the sink" and there was fecal matter visible "on the cell window." (*Id.* ¶ 98.) The 4AC further alleges

16

that Deputies Baca and Aberle debriefed Deputy Madrigal when he began his shift. (*Id.* ¶ 96.) It is reasonable to infer that during the debrief, Deputy Madrigal was told (1) that the deputies had a "difficult time processing Mr. Gil due to his behavior," (2) Mr. Gil was placed on a wheelchair to prevent him from falling again and (3) Mr. Gil displayed "severe thought disorganization, nonsensical communication, altered mental status, confusion, and an extremely unstable gait." (*Id.* ¶ 89.) The 4AC also alleges Deputy Madrigal was informed that Mr. Gil's daughter stated that he suffered from untreated diabetes and early on-set dementia. (*Id.* ¶ 96.) These allegations state a claim for deliberate indifference against Deputy Madrigal.

The 4AC alleges that when Deputy Maldonado began his shift, he was also debriefed by Deputies Baca and Aberle. (*4AC* ¶ 96.) Thus, the same inferences discussed in the previous paragraph regarding the debrief apply to Deputy Maldonado. The 4AC also alleges Deputy Maldonado conducted a safety check and directly observed Mr. Gil after he had defecated all over himself and his cell. (*Id.* ¶ 103.) Additionally, the 4AC alleges that by then, Mr. Gil had been "continually shaking and throwing up" and an "inmate stated Mr. Gil was experiencing seizures." (*Id.* ¶ 101.) These allegations state a claim for deliberate indifference against Deputy Maldonado.

Deputy Garcia conducted his first welfare check of Mr. Gil at 5:23 p.m. (*4AC* ¶ 105.) By then, Mr. Gil had defecated all over himself and the cell, looked sick, had been continually shaking and throwing up. (*Id.* ¶¶ 101, 103.) Additionally, the 4AC specifically alleges that before conducting his first welfare check, Deputy Garcia "walked through the intake area several times" throughout the day, during which he observed Mr. Gil "with his pants down, making animal noises such as chirping," observed feces on the ground and on his person, and that Mr. Gil was "shaking and visibly disoriented." (*Id.* ¶ 105.) Finally, by the time Deputy Garcia conducted his welfare check, he "observed Mr. Gil slumped over the sink, unresponsive, and gasping for air…." (*Id.*) Despite seeing Mr. Gil in this condition, the 4AC alleges Deputy Gil walked away. These allegations state a claim for deliberate indifference against Deputy Garcia.

1    According to the 4AC, Lt. Kamoss performed safety checks of Mr. Gil at 4:09

2 a.m., 5:05 a.m., and 5:10 a.m. (*4AC* ¶ 94.) During those safety checks, the 4AC alleges

3 "Mr. Gil continued to show signs of medical distress[,]" which included "signs of thought

4 disorganization, nonsensical communication, altered mental status, confusion, and an

5 unstable gait" but failed to intervene or to summon medical care. (*Id.*) The 4AC further

6 alleges Lt. Kamoss conducted a safety check after Mr. Gil defecated all over himself and

7 the cell, and "looked sick and was continually shaking and throwing up." (*Id.* ¶¶ 101,

8 103.) Despite Mr. Gil's clearly deteriorating condition, Lt. Kamoss failed to enter Mr.

9 Gil's "cell, ask Mr. Gil if he needed medical attention, or summon medical care." (*Id.* ¶

10 103.) These allegations state a claim for deliberate indifference against Lt. Kamoss.

11    Finally, the 4AC alleges that Sgt. Gomez, Deputy Angulo, Deputy Nuqui, Deputy

12 Quinones, Deputy Pozun and Deputy Cascioppo conducted safety checks of Mr. Gil after

13 he had defecated all over himself and the cell, looked sick, had been continually shaking

14 and throwing up. (*4AC* ¶¶ 101, 103.) The 4AC further alleges that after observing Mr. Gil

15 in his condition, they "failed to enter the cell, ask Mr. Gil if he needed medical attention,

16 or summon medical care." (*Id.* ¶ 103.) These allegations state a claim for deliberate

17 indifference against Sgt. Gomez, Deputy Angulo, Deputy Nuqui, Deputy Quinones,

18 Deputy Pozun and Deputy Cascioppo.

19

20    **B.   Plaintiffs' "Stunning Concession."**

21    In the reply, Defendants contend that "Plaintiffs make a stunning concession in

22 their Opposition that overshadows all of their previous positions and argument." (*Reply*

23 [Doc. 94] 1:2–3.) According to Defendants, the concession establishes "facts that

24 disprove their theories of liability. . . ." (*Id.* at 1:22–23.) The "established facts" appear to

25 be that "Mr. Gil **was acutely intoxicated with methamphetamine at the time of his**

26 **intake**" and thus that Mr. Gil's heart failure was connected or due to his

27 methamphetamine use. (*Id.* at 1:15–21, citing Ex. A, ¶ 121.) The argument lacks any

28 merit for at least two reasons.

18

23-cv-0899-W-DDL

First, Defendants' argument depends on factual statements made in the Declaration of Kelly S. Ramsey, M.D., for which Defendants have requested judicial notice. (*Defs' RJN* [Doc. 94-1] at 2:13–15, *Ex. A* [Doc. 94-2].) Because the declaration was filed in another case pending in this district, judicial notice of the document is warranted. However, that does not mean the facts stated in the declaration are considered true. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (on a motion to dismiss, a court may take judicial notice of undisputed "matters of public record," but not of disputed facts stated in public records). Instead, the only fact established as true is that the Ramsey Declaration was filed in that case. Because the Court may not consider as true the facts stated in the declaration that allegedly contradict Plaintiffs' theories, Defendants' argument lacks merit.[1]

Second, and more important, Defendants' argument again reflects a failure to recognize their Fourteenth Amendment obligation to Mr. Gil. The theory in Defendants' reply boils down to this: because Mr. Gil's heart failure is linked to methamphetamine use, the Individual Defendants were justified in providing no assistance when they observed him lying on the floor of his cell, seizing, covered in feces and vomit, and making strange noises. Defendants cite no case law supporting their theory, nor is the Court aware of any.

## C.    State-law immunity & Bane Act liability.

Defendants next argue they are all entitled to immunity under Government Code § 845.6 "because there are no facts to plausibly plead that any of them knew of Decedent's

---

[1] Defendants also argue the declaration may be considered under the incorporation by reference doctrine. This doctrine applies where "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint" and the document is authentic. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citation omitted). Here, the 4AC does not rely or mention the declaration. Accordingly, consideration of the declaration under the incorporation by reference doctrine is not appropriate.

19

need for *immediate* medical care—especially in light of the alleged erroneous diagnosis as someone simply sobering up." The Court disagrees. As discussed above, with the exception of Deputy Aberle, the 4AC's facts establish the Individual Defendants were aware Mr. Gil was in immediate need of medical care and failed to summon medical care. Accordingly, they are not entitled to immunity under section 845.6.

### D.    Bane Act Cause of Action

Defendants argue the Bane Act cause of action must be dismissed as to each of the Individual Defendants. The Court disagrees.

Numerous cases have applied the Bane Act to claims involving deliberate indifference, reasoning that since "deliberate indifference is closer to intentional conduct [than unintentional conduct]," liability exists where the government official "knows of and disregards a substantial risk to inmate health or safety." *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act [under the Bane Act] that rises above mere negligence . . . ."); *Cravotta v. Cnty. of Sacramento*, 2024 WL 645705, at *13 (E.D. Cal. Feb. 15, 2024) ("[A] Bane Act claim may be based on deliberate indifference to serious medical needs."); *Est. of Neil v. Cnty. of Colusa*, 2022 WL 4291745, at *9 (E.D. Cal. Sept. 16, 2022) ("Courts have also found that prisoners who sufficiently allege [that] officials acted with deliberate indifference to their medical needs in violation of their constitutional rights also adequately allege a Bane Act violation.").

In the context of deliberate indifference to the medical needs of prisoners, courts have held that a prisoner's Bane Act claim need simply allege "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *M.H.*, 90 F. Supp. 3d at 896 (quoting *Jett*, 439 F.3d at 1096); *see Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal.

20

2018) (emphasis added) ("Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials 'knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening,' such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations."); *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 802 n.31, as modified (Nov. 17, 2017) (citing with approval *M.H. v. County of Alameda*'s holding that a Bane Act claim can stated based on allegations of "deliberate indifference to prisoner's medical needs.").  While "mere negligence in diagnosing or treating a medical condition" does not give rise to a Bane Act claim, "prison officials or practitioners 'deny[ing], delay[ing], or intentionally interfere[ing] with medical treatment" does.  *M.H.*, 90 F. Supp. 3d at 896 (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988)).

    As discussed above, the 4AC sufficiently alleges objective deliberate indifference against all of the Individual Defendants, except Deputy Aberle. Accordingly, the 4AC sufficiently alleges a Bane Act claim against these defendants.


### E.    The Statute of Limitations

    Defendants argue that Plaintiffs' claims against the Individual Defendants do not relate back to the filing of the original complaint because they were added as new defendants and were not substituted in place of Doe Defendants as required by California Civil Code § 474. (*P&A* 18:3–17.) As proof, Defendants point out that like the Second Amended Complaint, the 4AC continues to assert claims against Does 1–10 in the First Cause of Action. (*Id.*) Because the claims do not relate back, Defendants argue the claims against the Individual Defendants are time barred. (*Id.* 19:1–4.) Plaintiffs respond that the claims against the Individual Defendants relate back to the filing of the original complaint because they were intended to be substituted in place of Doe Defendants. (*Opp'n* [Doc. 91] 24:21–22.)

1       Both parties contend California law governs the statute of limitations issue. Under

2  California law, "[t]he general rule is that an amended complaint that adds a new

3  defendant does not relate back to the date of filing the original complaint and the statute

4  of limitations is applied as of the date the amended complaint is filed, not the date the

5  original complaint is filed." *Woo v. Superior* Court, 75 Cal.App.4th 169, 176 (1999).

6  However, California Civil Code § 474 provides an exception where the amended

7  complaint substitutes the new defendant for a fictitious Doe defendant. *Id.* If section

8  474's requirements are satisfied, the amended complaint is deemed filed as of the date the

9  original complaint. *Id.*

10      In support of their argument, Defendants cite *Anderson v. Allstate Insurance Co.*,

11  630 F.2d 677 (1980), which held that strict compliance with section 474 is required.

12  There, plaintiffs' original complaint named Does 1 to 50. Plaintiffs then filed an amended

13  complaint that named new defendants but continued to include Does 1 to 50. Defendants

14  therefore moved to dismiss arguing that because the amended complaint continued to

15  name Does 1 to 50, the new defendants were not added as fictitious Does as required by

16  section 474 and thus the claims were time barred. The district court agreed and dismissed

17  the newly named defendants. The Ninth Circuit affirmed, finding that the "district court

18  was not clearly wrong in concluding that the dismissed defendants were not added to the

19  complaint, nor served, as fictitious defendants pursuant to section 474. . . ." *Id.* at 682. In

20  rejecting plaintiffs' contention that the failure to add the new defendants as fictitious

21  defendants should be treated as a technical pleading defect that could be corrected by

22  amendment, the Ninth Circuit relied on the admonition from *Ingram v. Superior Court*,

23  98 Cal.App.3d 483 (1979) that "some discipline in pleading is still essential to the

24  efficient processing of litigation." *Id.* at 683 (citing *Ingram*, 98 Cal.App.3d at 491).

25      While *Anderson* supports Defendants' argument, a slightly more recent Ninth

26  Circuit case disagreed with *Anderson*'s statement that strict compliance with section 474

27  is required. In *Lindley v. Gen. Elec. Co.*, 780 F.2d 797, 801 (1986), the court explained

28  that "we do not agree that strict compliance with section 474 is required. California's

policy in favor of litigating cases on their merits requires that the fictitious name statute
be liberally construed." *Id.* at 801 (citing *Barnes v. Wilson*, 40 Cal.App.3d 199, 203
(1974)). Because "it [was] clear that" the newly added defendant was "substituted for a
previously named fictitious defendant," *Lindley* held the claims were not time barred. *Id.*
801–802.

After *Lindley*, the California Court of Appeal in *Woo v. Superior Court*, 75
Cal.App.4th 169 (1999), disagreed with the admonition in *Ingram*, which *Anderson* relied
on in concluding strict compliance with section 474 was necessary. In addressing the
plaintiff's failure to add the defendants in place of fictitious Doe defendants, *Woo*
explained that "courts of this state have considered noncompliance with the party
substitution requirements of section 474 as a procedural defect that could be cured and
have been lenient in permitting rectification of the defect." *Id.* at 177 (citing *Streicher v.
Tommy's Electric Co.*, 164 Cal.App.3d 876, 884–885 (1985) and *Liberty Transport, Inc.
v. Harry W. Gorst Co.*, 229 Cal.App.3d 417, 428 (1991)).

Finally in *Reynolds v. Verbeck*, 2006 WL 3716589 (ND Cal. 2006), defendants in a
section 1983 lawsuit relied on *Anderson* in arguing the claims were time barred because
plaintiff failed to comply with section 474. In rejecting the argument, the court explained
that "[s]ince *Anderson* . . . California courts have been more lenient in applying the
requirements of section 474" and the "Ninth Circuit has indicated that strict compliance
with section 474 is not required." *Id.* at *3 (citing *Woo*, 75 Cal.App.4th at 177 and
*Lindley*, 780 F.2d at 801)). Instead, "California's policy in favor of litigating cases on the
merits requires that the fictitious name statute be liberally construed." *Id.* (citing *Lindley*,
780 F.2d at 801). Accordingly, the court concluded that "the determination of whether the
new defendants were added or substituted is left to the Court's discretion." *Id.* *4.
Although it did not appear that plaintiff substituted defendants in place of fictitious Does,
the court refused to dismiss the claims with prejudice because it preferred to decide the
case "on the merits rather than on counsel's failure to follow procedural rules." *Id.* *4.

23

1    Here, as in *Reynolds*, the Court "prefers to decide this case, and in particular, this

2    type of lawsuit, on the merits rather than on counsel's failure to follow procedural rules."

3    *Id.*at *4. Additionally, similar to *Lindley*, it is clear that Plaintiffs intended to add the

4    Individual Defendants in place of fictitiously named Does. For example, Plaintiffs

5    alleged in the original Complaint that after Mr. Gil lost his balance and fell during the

6    booking process, "[u]nknown deputies placed Mr. Gil in a wheelchair to prevent him

7    from falling. According to the San Diego Medical Examiner's report, Unknown DOE

8    Deputies had a difficult time processing Mr. Gil due to him being under the influence."

9    (*Compl.* [Doc. 1] ¶ 39.) The 4AC now identifies those "unknown deputies" as Deputies

10    Cassidy, Baca and Aberle. (*4AC* ¶ 89.) Additionally, the original Complaint alleged that

11    the "DOE NURSES 6-10 were grossly indifferent to Mr. Gil's serious medical needs

12    because Defendants were aware of Mr. Gil's medical distress but intentionally failed to

13    adequately screen, assess, or follow-up with Mr. Gil. . . ." (*Compl.* ¶ 60.) This is also the

14    basis for the claims against Nurses Rada, Munoz and Calderon in the 4AC. (*See e.g. 4AC*

15    ¶ 129.) Finally, the Second Amended Complaint alleged that for the nine and a half hours

16    that Mr. Gil was in his cell before he died, "each DOE deputy that performed hourly 11-

17    53 checks failed to intervene and failed to summon medical care" despite seeing "Mr. Gil

18    was in the cell, with fecal matter all over himself, and showing signs of medical distress. .

19    . ." (*SAC* [Doc. 16[2]] ¶ 55; *see also Compl.* ¶ 62 ("DOE Deputies 1–10 performed over a

20    dozen cell checks wherein each DOE Deputy saw Mr. Gil in sever medical distress yet

21    intentionally failed to intervene.").) As set detailed above regarding the deliberate

22    indifference claims, the Individual Defendants Deputies' liability in the 4AC is based on

23    their observation during cell checks of Mr. Gil in serious medical distress and failure to

24    intervene.

25

26

---

27    [2] The Second Amended Complaint was filed on January 10, 2024, and thus before the 2-year statute of

28    limitations expired.

Because the 4AC did not comply with the technical requirements of section 474, the Court will grant Defendants' motion to dismiss. However, because it appears the Individual Defendants were intended to be sued in place of fictitiously named Does and for the reasons stated in *Reynolds*, Plaintiffs are given leave to amend to substitute the Individual Defendants for fictitious Does.

## IV. CONCLUSION & ORDER

For the above reasons, the Court **GRANTS** Defendants' motion to dismiss the Individual Defendants [Doc. 81] **WITH LEAVE TO AMEND**. The Fifth Amended Complaint shall be filed on or before **January 7, 2026**.

**IT IS SO ORDERED.**

Dated:  December 17, 2025

Hon. Thomas J. Whelan
United States District Judge